IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

FILED

2014 AUG 18  PM 3: 26

CLERK US DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____
              DEPUTY

**THOMAS C. SISOIAN,**

           **Plaintiff,**

-vs-                                   **Case No.  A-14-CA-565-SS**

**INTERNATIONAL   BUSINESS   MACHINES
CORPORATION,**

           **Defendant.**

---

## O R D E R

       BE IT REMEMBERED on the 18th day of July, 2014, the Court held a hearing in the above-styled cause, and the parties appeared by and through counsel.  Before the Court are Defendant International Business Machines Corporation (IBM)'s Motion to Dismiss [#38],[1] Plaintiff Thomas C. Sisoian's Response [#39], Defendant IBM's Reply [#41], and Plaintiff Sisoian's Sur-Reply [#42]. Having considered the documents, the file as a whole, the governing law, and the parties' arguments at the hearing, the Court enters the following opinion and orders DENYING IN PART and GRANTING IN PART the motion.

---

[1]Plaintiff Sisoian originally filed this lawsuit in the Eastern District of Texas. Defendant IBM contended venue was improper and filed an opposed Motion to Transfer or Dismiss [#11].  After Sisoian filed his First and Second Amended Complaints [##17, 35], the court dismissed without prejudice IBM's motion to transfer or dismiss.  Shortly thereafter, IBM renewed its Motion to Transfer or Dismiss [#38].  For whatever reason, the parties came to an agreement to transfer the case to the Western District, and the matter founds its way to this Court.  Upon review of the docket sheet and based on the parties' representations, the only pending motion carried over from the Eastern District is the Motion to Transfer or Dismiss [#38].  Considering the parties already mooted the improper venue dispute by agreeing to transfer the lawsuit, the only pending aspect of that motion is whether the Second Amended Complaint passes Rule 12(b)(6) muster.  Therefore, the Court only addresses the motion to dismiss with this order.

**Background**[2]

The allegations center around what Plaintiff Thomas Sisoian calls the "Objectiva Architecture,"[3] which Sisoian developed in 1998 under Objectiva Innovations, Inc. (Objectiva). 2d Am. Compl. [#35], ¶ 5. Sisoian was the sole shareholder and creator of Objectiva, and he hired employees to help him develop the Objectiva Architecture. *Id.*, ¶¶ 6–7. Two of those employees were Francis Anderson and James Hartmann. *Id.*, ¶ 7. As part of their employment, these two signed employment agreements, which included a Confidentiality, Proprietary Information, and Trade Secrets agreement, requiring employees not to disclose Objectiva's proprietary information to any third party without prior written consent from Objectiva. *Id.*, ¶ 7. Ultimately, in October 2000, Objectiva was dissolved, and all assets were distributed to Sisoian as the sole shareholder. *Id.*, ¶ 8. At Sisoian's request, Hartmann (along with an individual named Patel) retained the digital source images and data files for the Objectiva Architecture. *Id.* As of dissolution, the Objectiva Architecture had never been sold or distributed. *Id.*

---

[2]The following recounting of the nature of this case derives from the Second Amended Complaint [#26] as the facts alleged therein are taken as true for present purposes. *See Leatherman v. Tarrant Cnty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 164 (1993).

[3]Sisoian describes the Objectiva Architecture as:

a complex information system that keeps track of a company's customers, including the customer's contact information, agreements that it has with respective enterprises, network events and their costs (e.g., local calls, long-distance calls, pages, texts, e-mail messages), taxes, discounts, invoices sent, and payments received. The Objectiva Architecture manages equipment being rented or purchased which includes charges for such equipment, its location, inventory available, and schedule of repairs. The Objectiva Architecture also manages products, which are combinations of the various pricing plans that a company offers its customers. Finally, the Objectiva Architecture connects to other systems for accounting, securing network events, and loading subscriber information.

2d Am. Compl. [#35], ¶ 5.

In March 1998, IBM hired Sisoian as Principal of Integration Services within the telecommunications sector and later as Director of Product Management of the IBM Software Group. *Id.*, ¶ 9. In September 1999, Sisoian hired Anderson at IBM as a product architect. As part of their employment with IBM, both Sisoian and Anderson signed an Agreement Regarding Confidential Information, Intellectual Property, and Other Matters, whereby they each agreed to assign to IBM all right, title, and interest to works of authorship developed during their employment with IBM. *Id.* The agreements, however, expressly excluded the Objectiva Architecture. *Id.* Upon employment with IBM, Anderson returned his copy of the Objectiva Architecture to Sisoian. *Id.*

In December 2001, unbeknownst to Sisoian, Anderson approached Hartmann, told him he was on Objectiva company business, requested a copy of the Objectiva Architecture from Hartmann, and secured a copy. *Id.*, ¶ 10. Anderson then disclosed the Objectiva Architecture to IBM without Sisoian's knowledge. *Id.*, ¶ 11. IBM used the Objectiva Architecture as the basis for its WebSphere Telco Content Pack (WTCP), and it created the architecture for WTCP in "stealth mode," or in secret, which is against IBM corporate policy. *Id.* In 2004, IBM began marketing and selling WTCP, reaping large revenues. *Id.*

On December 1, 2010, Sisoian received an email from a co-worker describing WTCP, and Sisoian noticed its similarities to the Objectiva Architecture. *Id.*, ¶ 12. Prior to this email, Sisoian had never seen WTCP and was unaware it was similar to the Objectiva Architecture. *Id.* WTCP is a telecommunications package, and Sisoian had been banned from IBM's telecommunications sector and its accounts in 2002. *Id.* Also, IBM is a large company with five major divisions and more than 400,000 employees, making it difficult for Sisoian to know about of all of its product offerings and inner workings. *Id.*

-3-

In April 2011, Anderson prepared a PowerPoint presentation on WTCP for IBM's Executive VP of Services Strategy, and he acknowledged the Objectiva Architecture is "essential to the success" of WTCP, the Objectiva Architecture provided the basis for WTCP, the Objectiva Architecture was separated from Anderson upon his hire at IBM, and a solution must be found for IBM using the Objectiva Architecture while not owning it. *Id.*, ¶ 13. Anderson forwarded a copy of the PowerPoint presentation to Sisoian on April 26, 2011. Anderson delivered the PowerPoint presentation to IBM executives in May 2011. *Id.* Anderson continued to work for IBM in connection with WTCP until he was terminated in April 2012. *Id.*

Following receipt of the PowerPoint presentation, Sisoian began investigating and realized IBM had used the Objectiva Architecture without his permission. *Id.*, ¶¶ 14–15. In September 2011, he filed an internal complaint with IBM, notifying IBM he was the owner of the Objectiva Architecture, and he was aware IBM had used it as part of WTCP. *Id.*, ¶ 15. IBM conducted an investigation and concluded in May 2012 it did not agree with Sisoian's assertions. *Id.*

In April 2013, Sisoian filed a lawsuit in the Eastern District of Texas against IBM, asserting: (1) common law trade secret misappropriation; (2) violations of the Texas Theft Liability Act (TTLA);[4] (3) breach of fiduciary duty;[5] and (4) conspiracy. In June 2014, the parties agreed to

---

[4]Last year, Texas adopted the Uniform Trade Secrets Act, making it effective on September 1, 2013. S.B. 953, 83rd Leg., R.S., ch. 10, § 1, 2013 Tex. Sess. Law Serv. (the Texas Uniform Trade Secrets Act or TUTSA). TUTSA creates a new chapter 134A in the Civil Practice & Remedies Code that applies to "the misappropriation of a trade secret made on or after the effective date." *Id.* Therefore, because the misappropriation in this case occurred years before September 2013, TUTSA is not an available mechanism for Sisoian. Prior to TUTSA, there were two sources of law available to a party who believed its trade secret had been misappropriated: (1) the common law of trade secret misappropriation, and (2) the TTLA. Sisoian has asserted causes of action under both, and the Court analyzes his claims based on the law as it existed prior to the adoption of TUTSA.

[5]The alleged fiduciary duty at issue is the one Anderson owed to Objectiva (and, in turn, Sisoian), and which Anderson allegedly breached in obtaining a copy of the Objectiva Architecture from Hartmann and sharing it with IBM without Sisoian's knowledge in violation of his confidentiality agreement he signed as an employee of Objectiva. Sisoian connects Anderson's breach to IBM by asserting: (1) joint tortfeasor liability on the theory IBM induced Anderson to

-4-

transfer the case to this Court, and the only pending motion carried over is the instant motion to dismiss.

## Analysis

### I.      Rule 12(b)(6)—Legal Standard

Federal Rule of Civil Procedure 8(a)(2) requires a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2).  A motion under Federal Rule of Civil Procedure 12(b)(6) asks a court to dismiss a complaint for "failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6).  In deciding a motion to dismiss under 12(b)(6), a court generally accepts as true all factual allegations contained within the complaint. *Leatherman*, 507 U.S. at 164.  However, a court is not bound to accept legal conclusions couched as factual allegations. *Papasan v. Allain*, 478 U.S. 265, 286 (1986).  Although all reasonable inferences will be resolved in favor of the plaintiff, the plaintiff must plead "specific facts, not mere conclusory allegations." *Tuchman v. DSC Commc'ns Corp.*, 14 F.3d 1061, 1067 (5th Cir. 1994).  The plaintiff must plead sufficient facts to state a claim for relief that is facially plausible. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.  Although a plaintiff's factual allegations need not establish the defendant is probably liable, they must establish more than a "sheer possibility" that a defendant has acted unlawfully. *Id.*  Determining plausibility is a "context-specific task," that must be performed in light

---

breach his fiduciary duty; and (2) respondeat superior liability on the theory Anderson breached his duty to Sisoian while an employee of IBM and acting within the scope of his duties. .

of a court's "judicial experience and common sense." *Id.* at 679. In deciding a motion to dismiss, courts may consider the complaint, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, such as documents incorporated into the complaint by reference, and matters of which a court may take judicial notice. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

## II.      Application

### A.      Statute of Limitations

IBM argues Sisoian's claims are barred by the relevant statutes of limitations. The parties disagree on three issues: (1) the relevant limitations periods; (2) the applicability of the discovery rule; and (3) whether Hartmann's knowledge may be imputed to Sisoian.

#### 1.      The Applicable Limitations Periods

First, the Court establishes the applicable limitations periods for the four causes of action at issue. The parties agree a plaintiff must file a lawsuit for common law trade secret misappropriation "not later than three years after the misappropriation is discovered or by the exercise of reasonable diligence should have been discovered." TEX. CIV. PRAC. & REM. CODE § 16.010(a). The parties also agree a breach of fiduciary duty claim must be brought within four years of the day the cause of action accrues. *See id.* § 16.004(a)(5).

The parties disagree, however, concerning the relevant limitations periods for TTLA violations and conspiracy. The TTLA does not provide a statute of limitations. IBM contends the limitations period for the TTLA is two years, relying on *J&J Sports Prods., Inc. v. JWJ Mgmt., Inc.*, 324 S.W.3d 823, 832 (Tex. App.—Fort Worth 2010, no pet.). Sisoian distinguishes the facts of *J&J*

*Sports* from those in this case and argues the limitations period for a common law misappropriation of trade secrets claim should be applied to a TTLA theft of trade secrets claim.

In *J&J Sports*, the court was trying to determine the limitations period for a claim under the Federal Communications Act (FCA) for unauthorized reception of cable transmissions. *Id.* at 824. Because the FCA does not provide a limitations period, the court considered analogous federal and state statutes and their respective limitations periods. *Id.* at 830–31. Ultimately, the court concluded the most analogous statute was the TTLA because it creates a civil right of action, via TEX. CIV. PRAC. & REM. CODE § 134.002, for violations of Texas Penal Code § 31.12 (Theft of or Tampering with Multichannel Video or Information Services). *Id.* In determining the statute of limitations for section 134.002, the court turned to section 16.003(a) of the Texas Civil Practice and Remedies Code, which provides a residual two-year limitations period for trespass to or the taking of personal property except where otherwise provided. *Id.* at 832. Since there was no limitations period otherwise provided for this sort of claim, the court applied a two-year limitations period to the FCA claim for cable piracy. *Id.*

Sisoian's TTLA claim for theft of trade secrets, however, is different from a TTLA claim premised on cable piracy, and there is a limitations period otherwise provided for trade secret misappropriation claims. The TTLA, prior to the adoption of TUTSA, was the statutory mechanism for a trade secret misappropriation claim as it created a civil right of action, via TEX. CIV. PRAC. & REM. CODE § 134.002, for violations of Texas Penal Code § 31.05 (Theft of Trade Secrets). IBM wants the Court to apply the two-year residual limitations period from section 16.003(a) as the court did in *J&J Sports*. Section 16.003(a), however, imposes a two-year limitations period "[e]xcept as provided by Section[] 16.010." TEX. CIV. PRAC. & REM. CODE § 16.003(a). Section 16.010, titled

"Misappropriation of Trade Secrets," provides "[a] person must bring suit for misappropriation of trade secrets not later than three years after the misappropriation is discovered or by the exercise of reasonable diligence should have been discovered." *Id.* § 16.010(a). Section 16.010 does not limit its scope to common law misappropriation of trade secrets, and the Court sees no reason why a claim for theft of trade secrets under the TTLA would not qualify as a "suit for misappropriation of trade secrets" under section 16.010. While there appears to be little case law on this issue, the Tyler Court of Appeals recently applied, in a thorough opinion, section 16.010 to both a common law misappropriation of trade secret claim as well as a TTLA theft of trade secret claim. *See Sw. Energy Prod. Co. v. Berry-Helfand*, 411 S.W.3d 581, 602–04 (Tex. App.—Tyler 2013, pet. filed). Moreover, common sense suggests the limitations period for common law misappropriation and statutory theft of trade secrets claims should be consistent. Therefore, the Court applies a three-year limitations period to Sisoian's TTLA claim for trade secret theft.

With respect to civil conspiracy, IBM argues the limitations period is two years while Sisoian contends the limitations period for the tort underlying the conspiracy should control. The Court agrees with IBM. In *Navarro v. Grant Thornton, LLP*, 316 S.W.3d 715, 719 (Tex. App.—Houston [14th Dist.] 2010, no pet.), the court, unable to identify a Texas Supreme Court case addressing which limitations period should apply to conspiracy claims, concluded section 16.003's two-year period applies despite the fact the underlying fraud claim carried a four-year limitations period. *See also Aubrey v. Barlin*, No. A-10-CA–076, 2014 WL 1872298, at *5 (W.D. Tex. May 7, 2014) (finding section 16.003's two-year period applies to conspiracy to commit fraud). Indeed, the court in *Navarro* rejected the same argument made by Sisoian in reaching this conclusion. *Navarro*, 316 S.W.3d at 719. While conspiracy is a derivative tort, Sisoian offers no support for the argument the

-8-

limitations period applicable to conspiracy claims is not two years. Therefore, the statute of limitations for the conspiracy claim is two years.

### 2.        The Discovery Rule and Whether it Applies

The discovery rule "'operates to defer accrual of a cause of action until the plaintiff knows or, by exercising reasonable diligence, should know of the facts giving rise to the claim.'" *Priester v. JP Morgan Chase Bank, N.A.*, 708 F.3d 667, 675 (5th Cir. 2013) (quoting *Wagner & Brown, Ltd. v. Horwood*, 58 S.W.3d 732, 734 (Tex. 2001)). It is a "'very limited' exception and will be applied only 'when the nature of the plaintiff's injury is both inherently undiscoverable and objectively verifiable.'" *Id.* (quoting *Wagner & Brown*, 58 S.W.3d at 734). Texas courts have "set the 'inherently undiscoverable' bar high, to the extent that the discovery rule will apply only where it is nearly impossible for the plaintiff to be aware of his injury at the time he is injured." *Id.* (citing *S.V. v. R.V.*, 933 S.W.2d 1, 6–7 (Tex. 1996)). Courts determine "whether an injury is inherently undiscoverable on a categorical basis because such an approach brings predictability and consistency to the jurisprudence." *Wagner & Brown*, 58 S.W.3d at 735 (internal quotation omitted). In other words, the question is whether the injury is the type "that generally is discoverable by the exercise of reasonable diligence." *Id.* (internal quotation omitted).

In the instant case, Sisoian argues the discovery rule applies to all of his asserted causes of action while IBM contends it applies to none of them except the common law misappropriation claim. *See* TEX. CIV. PRAC. & REM. CODE § 16.010(a).

Concerning the TTLA claim, IBM relies on *Nabelek v. Bradford*, No. 14-01-00240-CV, 2002 WL 1438662 (Tex. App.—Houston [14th Dist.] 2002, pet. denied), and *Computer Assocs. Int'l, Inc. v. Altai, Inc.*, 918 S.W.2d 453 (Tex. 1996). In *Nabelek*, the plaintiff sued the city and its police chief

-9-

for personal injury, conversion, and violation of his constitutional rights for failure to return property seized by the police but not used at the plaintiff's criminal trial for sexual assault of child and possession of child pornography. *Nabelek*, 2002 WL 1438662, at *1. The court found the plaintiff had not complied with the two-year statute of limitations of section 16.003 and further concluded the discovery rule did not apply because the plaintiff's injury was not "inherently undiscoverable." *Id.* at *3–4. The court reasoned a police department's failure to return seized property within the appropriate time period after trial is the sort of injury that is, with the exercise of reasonable diligence, discoverable. *Id.* at *4.

Sisoian's TTLA claim, however, is premised on trade secret theft and is distinct from the conversion claim in *Nabelek*. The *Nabelek* court applied section 16.003 to the conversion claim, but as explained above, section 16.003 includes an exception for section 16.010, which provides a three-year statute of limitations as well as the discovery rule for "suits for misappropriation of trade secrets." Sisoian's TTLA claim is a suit for theft of trade secrets, and the Court, therefore, applies the discovery rule from section 16.010 to this claim as it did above in Part II(A)(1) with the three-year limitations period. *See Sw. Energy Prod. Co.*, 411 S.W.3d 581, 602–04 (applying section 16.010's three-year limitations period and its discovery rule to both a common law misappropriation of trade secret claim and a TTLA theft of trade secret claim).

The other case relied on by IBM, *Altai*, considered whether the discovery rule applied to toll the limitations period for trade secret misappropriation claims, and the Texas Supreme Court declined to "overlay section 16.003(a) with the discovery rule exception for misappropriation of trade secret causes of action." *Altai*, 918 S.W.2d at 458. Section 16.010, however, was adopted in 1997—after *Altai*—and specifically extended the limitations period to three years and provided the

discovery rule to claims for trade secret misappropriation.  *See* TEX. CIV. PRAC. & REM. CODE § 16.010; *see also Gen. Universal Sys., Inv. v. HAL, Inc.*, 500 F.3d 444, 449 n.2 (5th Cir. 2007). Therefore, the Court concludes the discovery rule is applicable to Sisoian's TTLA claim for trade secret theft.

With respect to the breach of fiduciary duty claim, IBM concedes the discovery rule typically applies to such claims, but contends it does so only as long as the fiduciary duty lasts.  Because IBM asserts Anderson's supposed fiduciary duty ended by late 1999 when he no longer worked for Objectiva and had returned its confidential information, then the discovery rule does not apply after this date.  *See* Mot. Dismiss [#38], at 18–19.  In other words, IBM does not dispute the applicability of the discovery rule, but rather argues the breach of fiduciary duty claim fails because Anderson's alleged breach occurred when he no longer had a fiduciary relationship.

While the fiduciary relationship might have ended, Anderson still owed a duty not to disclose confidential information after he no longer worked for Objectiva.[6]  According to Sisoian's allegations, Anderson, as part of his employment with Objectiva, signed a Confidentiality, Proprietary Information, and Trade Secrets agreement, requiring employees not to disclose Objectiva's proprietary information to any third party without prior written consent from Objectiva. 2d Am. Compl. [#35]., ¶ 7.  Therefore, even though Anderson returned his copy of the Objectiva Architecture and his Objectiva-issued laptop when his employment with Objectiva ended in September 1999, he still could not disclose proprietary information to third parties.  Therefore,

---

[6]*See Sealed Party v. Sealed Party*, No. H-04-229, 2006 WL 1207732, at *7 (S.D. Tex. May 4, 2006) ("Courts applying Texas law indicate that generally a fiduciary's duty to preserve confidential information survives the termination of the fiduciary relationship.") (citing *Clinkenbeard v. Cent. S.W. Oil Corp.*, 526 F.2d 649, 652 n.3 (5th Cir 1976) (recognizing that a fiduciary owes certain duties after the agency terminates, "such as the duty not to . . . disclose confidential information") (internal quotation omitted)); *see also American Derringer Corp. v. Bond*, 924 S.W.2d 773, 777 (Tex. App.—Waco 1996, no writ) (same).

Sisoian has sufficiently alleged a breach of fiduciary duty, and the discovery rule applies to this claim.

Finally, with respect to civil conspiracy, IBM cites *Little v. Smith*, 943 S.W.2d 414 (Tex. 1997), for the proposition the discovery rule does not apply to civil conspiracy claims while Sisoian cites *Fisher v. Yates*, 953 S.W.2d 370 (Tex. App.—Texarkana 1997, no writ), for the opposite contention. Neither case analyzed whether the discovery rule applies to conspiracy claims as a general rule but rather examined the underlying claim and injury to determine whether the discovery rule was applicable. *Little* involved an adoptee, claiming to be the decedent's biological grandchild, who brought an action in which she demanded an interest in the assets of the decedent's estate and included, among her various causes of action, a conspiracy count. *Little*, 943 S.W.2d at 415–16. The court, considering legislative choices and policies, concluded the discovery rule should not apply to the right to assert inheritance claims and did not apply the discovery rule to any of the adoptee's causes of action, including conspiracy. *Id.* at 419–20. *Fisher* involved a plaintiff asserting fraud and conspiracy to commit fraud in connection with a stock acquisition. *Fisher*, 953 S.W.2d at 374. The court applied the discovery rule because "the discovery rule applies to conspiracy to commit fraud." *Id.* at 380 (citing *Cathey v. First City Bank of Aransas Pass*, 758 S.W.2d 818, 822 n.3 (Tex. App.—Corpus Christi 1988, writ denied)).

In the instant case, the Court has already determined the discovery rule applies to Sisoian's other three claims concerning misappropriation of trade secrets and breach of fiduciary duty. Accordingly, it only makes sense to apply the discovery rule to a conspiracy claim to commit these same alleged acts, especially considering the legislature's specific choice to apply the discovery rule to misappropriation of trade secret lawsuits via section 16.010.

-12-

3.      **Agency and Imputation**

IBM contends, even if the discovery rule applies, Sisoian's claims are still time-barred because Sisoian actually or constructively knew of Anderson's allegedly improper acquisition of the Objectiva Architecture in 2001. Specifically, IBM argues Hartmann, from whom Anderson procured the Objectiva Architecture, was Sisoian's agent, and an agent's knowledge is imputed to the principal. Sisoian responds Hartmann's knowledge should not be imputed to him because: (1) Hartmann was acting outside the scope of his authority; (2) Hartmann was merely a ministerial agent; and (3) Anderson and IBM are not innocent third parties and therefore cannot be protected by the agent-to-principal imputation rule meant to safeguard innocent third parties. Because the Court concludes Sisoian's allegations support finding Hartmann was acting outside the scope of his authority, it denies IBM's imputation argument on this ground, and does not address Sisoian's other two arguments.

The knowledge of an agent may be imputed to the principal. *Poth v. Small, Craig & Wekenthin, L.L.P.*, 967 S.W.2d 511, 515 (Tex. App.—Austin 1998, pet. denied). Before notice or knowledge is imputed from agent to principal, however, "the rule seems to be that it must first be shown that the authority of such agent extended to the very matter about which and concerning which such knowledge or notice was obtained." *Auto. Ins. Co. of Hartford, Conn. v. United Elec. Serv. Co.*, 275 S.W.2d 833, 840 (Tex. App.—Fort Worth 1955, writ ref'd n.r.e.) (citations omitted). "An agent's authority to act for its principal may be demonstrated in any one of three ways: express actual authority, implied actual authority, or apparent authority." *Toonen v. United Servs. Auto. Ass'n*, 935 S.W.2d 937, 941 (Tex. App.—Houston [14th Dist.] 1996, no writ). "Express authority is delegated to an agent by words that expressly and directly authorize the agent to do an act or series

of acts on behalf of the principal." *Nears v. Holiday Hospitality Franchising, Inc.*, 295 S.W.3d 787, 795 (Tex. App.—Texarkana 2009, no pet.) (citation omitted). "Implied authority is the authority to do whatever is reasonably necessary and proper to carry out the agent's express powers." *Id.* (citation omitted). Apparent authority is the manifestation of the agent's authority by the principal to the third party. *See Cactus Pipe & Supply Co., Inc. v. M/V Montmartre*, 756 F.2d 1103, 1111 (5th Cir. 1985).

In the instant case, Sisoian's allegations rule out a finding Hartmann had express authority or apparent authority. As for any implied authority, Sisoian does not clearly describe the alleged authority given Hartmann. All he claims is that he "asked Hartmann . . . to retain the digital source images and data files for the Objectiva Architecture." 2d Am. Compl. [#35], ¶ 8. Hartmann also signed the Confidentiality, Proprietary Information, and Trade Secrets agreement, requiring employees not to disclose Objectiva's proprietary information to any third party without prior written consent from Objectiva. *Id.*, ¶ 7. Construing these allegations in the light most favorable to Sisoian, Hartmann was only authorized to *retain* the Objectiva Architecture, not release it to Anderson, even if Anderson claimed to be seeking the information on behalf of Objectiva. Moreover, Hartmann was bound by the confidentiality agreement he signed. Therefore, in giving Anderson the Objectiva Architecture, the allegations support a finding Hartmann was acting outside the scope of his authority as Sisoian's agent, and his knowledge is not imputed to Sisoian. Moreover, whether an agent was acting within the scope of the agency at the time of committing the act is a question of fact unless the agent's authority (or lack thereof) is clearly established. *See Geders v. Aircraft Engine and Accessory Co., Inc.*, 599 S.W.2d 646, 650 (Tex. App.—Dallas, 1980, no writ). In other words, this

issue of the scope of Hartmann's authority would better be resolved with a full evidentiary record, not at the Rule 12 stage.

IBM, relying on *Grant Thornton LLP v. Prospect High Income Fund*, 314 S.W.3d 913 (Tex. 2010), argues Sisoian is impermissibly attempting to rely on Hartmann's knowledge for purposes of his fraud claim while denying imputation of Hartmann's knowledge concerning the statute of limitations.  Sisoian, however, does not assert a cause of action for fraud, and none of his four asserted causes of action require reliance upon Hartmann.  While Sisoian's allegations are tinged with allegations of fraudulent behavior on the part of Anderson and IBM, the fact is Sisoian has not affirmatively alleged fraud as one of his causes of action, and the Court fails to see how *Grant Thornton*'s holding is applicable to this case.

Accordingly, the Court does not impute Hartmann's knowledge to Sisoian, and the statute of limitations clock for Sisoian's claims were not triggered in December 2001 when Hartmann provided Anderson with the Objectiva Architecture.

**4.      Summary**

Having established the relevant limitations periods, the applicability of the discovery rule, and the imputation issue, the Court can now address whether each of Sisoian's claims are time-barred.  According to Sisoian's allegations, he did not know, nor by exercising reasonable diligence should he have known, of the facts giving rise to his claims until he received the email from a co-worker referencing IBM product offerings (WTCP) similar to the Objectiva Architecture on December 1, 2010.  Accordingly, Sisoian contends December 1, 2010, is the triggering date for the relevant statutes of limitations.

As to whether Sisoian actually personally knew of the facts giving rise to his claims earlier than December 1, 2010, he has alleged he had no such knowledge, and the Court has rejected IBM's imputation argument. As to whether Sisoian, with the exercise of reasonable diligence, should have known of these facts, he has alleged that although he has worked for IBM since 1998, he had not worked with the telecommunications sector—the sector responsible for WTCP—since 2002, and he had no access to the telecommunications sector's accounts since 2002. Indeed, he had apparently been banned from the telecommunications sector since 2002 for undisclosed reasons. In addition, Sisoian has alleged IBM is an enormous company with numerous divisions and over 400,000 employees, and the software division alone has over 5,000 products on the market. Given these circumstances, Sisoian contends he could not have discovered WTCP and its similarity to the Objectiva Architecture any earlier than December 1, 2010.

The Court is somewhat perplexed by this representation. For instance, the Court wonders: did Sisoian at any point over the roughly ten years between Anderson's re-acquisition of the Objectiva Architecture from Hartmann and the December 1, 2010 email ever communicate with Hartmann? Could he have not learned from Hartmann that Anderson had obtained a copy of the Objectiva Architecture while supposedly on Objectiva business, which Sisoian would have immediately recognized as false? Nevertheless, the Court construes Sisoian's allegations in the light most favorable to him and accepts, with the benefit of the discovery rule, December 1, 2010, as the triggering date for the statutes of limitations. Furthermore, whether Sisoian knew of the facts giving rise to his claims or, with the exercise of reasonable diligence, should have known strikes the Court as a fact issue better resolved at summary judgment or trial.

-16-

The statute of limitations for Sisoian's misappropriation of trade secret claim and theft of trade secret claim under the TTLA is three years, meaning the limitations period lapsed on December 1, 2013. Therefore, this lawsuit filed in April 2013 is timely concerning these claims. The statute of limitations for the breach of fiduciary duty claim is four years, and therefore this claim was also timely filed.

The conspiracy claim, however, has a limitations period of two years, meaning it lapsed on December 1, 2012. Therefore, the conspiracy count is time-barred. Sisoian attempts to avoid this outcome by arguing that "'under civil conspiracy, each continued invasion of the plaintiff's interest causing loss and damage in a conspiracy case is treated as an independent element for limitations purposes and the two year limitations begins to run when each independent element arises.'" *See* Resp. [#39], at 21–22 (quoting *Mayes v. Stewart*, 11 S.W.3d 440, 453 (Tex. App.—Houston [14th Dist.] 2000, pet. denied)). Sisoian contends he alleged IBM conspired with Anderson to breach his fiduciary duty, and Anderson breached the duty by presenting his PowerPoint to IBM executives in May 2011 and by continuing to drive awareness, certification, and commendations for WTCP through April 14, 2012. Under this view, Sisoian contends the conspiracy claim is not time-barred.

The Court sees the issue differently. Sisoian has alleged a conspiracy between Anderson and IBM to both: (1) breach a fiduciary duty, and (2) misappropriate a trade secret. *See* 2d Am. Compl. [#35], ¶¶ 37–38. As described above in Part II(A)(2), the fiduciary duty Anderson owed after the termination of his employment with Objectiva was not to disclose confidential information to third parties. According to Sisoian's allegations Anderson allegedly violated this duty when he obtained the Objectiva Architecture from Hartman in 2001 and afterward disclosed it to IBM, which used it as the basis for WTCP. *See id.*, ¶¶ 10–11. While it is not clear when he actually made this

-17-

disclosure, it happened before 2004 because Sisoian alleges IBM began marketing, selling, and distributing WTCP in 2004. *Id.*, ¶ 11. The Court fails to see how the PowerPoint presentation in May 2011 and Anderson's continuing efforts to promote WTCP through April 2012 constitute new breaches of his duty not to disclose confidential information. If IBM had already used the Objectiva Architecture as the basis for WTCP in 2004 (or prior), a PowerPoint presentation to IBM executives and efforts to promote WTCP cannot fairly be characterized as "disclosures" of the Objectiva Architecture. Accordingly, the Court does not find these alleged acts restarted the limitations clock on Sisoian's conspiracy to breach a fiduciary duty claim.

As for the second conspiracy theory, "a misappropriation of trade secrets that continues over time is a single cause of action and the limitations period described by Subsection (a) begins running without regard to whether the misappropriation is a single or continuing act." TEX. CIV. PRAC. & REM. CODE § 16.010(b). Therefore, this claim too began running on December 1, 2010, and it too is time barred.

In sum, Sisoian's claims for (1) common law misappropriation of trade secrets, (2) violations of the TTLA, and (3) breach of fiduciary duty were filed timely, but his conspiracy cause of action is time-barred.

## B.      Impact of the Dissolution of Objectiva

IBM next argues Sisoian's claims must be dismissed because all of the asserted claims actually belong to Objectiva, and Objectiva's claims were extinguished by law when the statutory three-year post-dissolution winding-up period expired. Sisoian responds that the Objectiva Architecture passed to him as an asset upon dissolution of Objectiva, and the claims at issue arose after dissolution and after the assets had already passed to Sisoian. Therefore, Sisoian argues he may

-18-

now assert these claims, and the statutory wind-up period for corporate claims is irrelevant to the allegations in this case. The Court agrees with Sisoian.

Under Delaware law,[7] dissolved corporations "shall nevertheless be continued" for a term of three years from dissolution "for the purpose of prosecuting and defending suits, whether civil, criminal or administrative, by or against them" and to permit an orderly winding-up of the corporations's affairs." 8 DEL. CODE § 278. When the three-year period expires, any unaccrued or unasserted claims are extinguished. *See In re Krafft-Murphy Co., Inc.*, 62 A.3d 94, 101 (Del. Ch. 2013), *rev'd on other grounds*, 82 A.3d 696 (Del. 2013). In addition, following the dissolution of a corporation, "[a]ny remaining assets shall be distributed to the stockholders of the dissolved corporation." 8 DEL. CODE § 281; *see also Cannon v. Denver Tramway Corp.*, 373 A.2d 580, 583 (Del. Ch. 1977) ("[T]he property of a dissolved corporation belongs to those persons who were stockholders at the time of its dissolution.").

In this case, Sisoian has alleged Objectiva was dissolved in 2000, and all of its assets, including the Objectiva Architecture, passed to him as the sole shareholder. Then, in 2001, Anderson obtained the Objectiva Architecture from Hartmann, and later disclosed it to IBM sometime between 2001 and 2004. Also, during this period, IBM used the Objectiva Architecture as the basis for WTCP, which it began selling in 2004. Therefore, according to Sisoian's allegations, no claim relating to the Objectiva Architecture actually arose until after Objectiva had been dissolved and after this asset had already been distributed to Sisoian. As such, these claims are Sisoian's, not

---

[7]Objectiva was a Delaware corporation. *See* 2d Am. Compl. [#35], ¶ 6. Whether a foreign corporation exists for purposes of asserting a claim is determined by the law where it is incorporated. *See Doucakis v. Speiser, Krause, Madole, P.C.*, 2002 WL 1397155, at *3 (Tex. App.—El Paso 2002, no pet.); *see also Highland Crusader Offshore Partners, L.P. v. Andrews & Kurth, L.L.P.*, 248 S.W.3d 887, 890 n.4 (Tex. App.—Dallas 2008, no pet.) ("Delaware law governs the internal affairs of Motient, a Delaware corporation.").

Objectiva's, and the winding-up period for Delaware corporations does not apply.  The Court finds this understanding to be more tenable than IBM's.

Under IBM's view, what if IBM misappropriated the Objectiva Architecture in, say, 2013? Would Sisoian, as the owner of the Objectiva Architecture asset, be allowed to sue IBM?  As the Court understand's IBM's argument, Sisoian would be barred from asserting such a suit because the three-year period starting with Objectiva's dissolution had lapsed; this outcome strikes the Court as incorrect.  It cannot be the case IBM is free to misappropriate the Objectiva Architecture after § 278's three-year period has lapsed.  The "intention of [§ 278] was . . . to balance the competing public policy interests of ensuring that claimants against the corporation had a time period in which to assert claims against the dissolved corporation and ensuring that directors, officers, and stockholders of a dissolved corporation could have repose from claims regarding the dissolved corporation."  *Krafft-Murphy*, 62 A.3d at 101.  In other words, § 278 seeks to protect creditors and shareholders from losing their investments with dissolved corporations.  The statute was not created to provide a three-year window during which the individual inheritors of corporate assets are permitted to assert claims which have yet to accrue.  Therefore, the Court rejects § 278 as a basis for dismissing Sisoian's causes of action.

**C.     The Objectiva Architecture's Trade Secret Status**

IBM disputes Sisoian has adequately pleaded the Objectiva Architecture as a trade secret primarily because there are no allegations indicating the Objectiva Architecture was in "continuous use" or otherwise adequately "used" as required by trade secret law.  The Court concludes Sisoian has adequately alleged the Objectiva Architecture as a trade secret.

A trade secret is "any formula, pattern, device or compilation of information which is used in one's business and presents an opportunity to obtain an advantage over competitors who do not know or use it." *In re Bass*, 113 S.W.3d 735, 739 (Tex. 2003). To determine whether a trade secret exists, the Texas Supreme Court applies the following six-factor test:

> (1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken to guard the secrecy of the information; (4) the value of the information to the business and to its competitors; (5) the amount of effort or money expended in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*In re Union Pac. R.R. Co.*, 294 S.W.3d 589, 592 (Tex. 2009) (citations omitted).

Furthermore, the Texas Supreme Court has stated "the party claiming a trade secret should not be required to satisfy all six factors because trade secrets do not fit neatly into each factor every time." *Bass*, 113 S.W.3d at 740. The court noted:

> It is not possible to state precise criteria for determining the existence of a trade secret. The status of information claimed as a trade secret must be ascertained through a comparative evaluation of all the relevant factors, including the value, secrecy, and definiteness of the information as well as the nature of the defendant's misconduct.

*Id.* (quoting RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 39 cmt. d (1995)).

IBM contends a person must make "continuous use" of his trade secret to obtain legal protection. *See* Mot. Dismiss [#38], at 21 (citing *CQ, Inc. v. TXU Mining Co., L.P.*, 565 F.3d 268, 275 (5th Cir. 2009) (citing RESTATEMENT OF TORTS § 757, cmt. b); *Hyde Corp. v. Huffines*, 314 S.W.2d 763, 776 (Tex. 1958) (same)). To the extent these opinions—one from the Fifth Circuit and one from more than fifty years ago—stand for the proposition of Texas law suggested by IBM, this Court declines to follow them in lieu of the more recent opinions from the Texas Supreme Court

cited above, which do not reflect a "continuous use" requirement and further indicate the trade secret inquiry is a flexible one not dependent on any one factor.

Sisoian alleged in detail what the Objectiva Architecture is, the market advantages it possesses, the resources exhausted to create it, the confidential circumstances under which it was developed, and the measures taken to protect it from general release to the public. *See generally* 2d. Am. Compl., ¶¶ 5–9. While IBM's emphasis of Sisoian's own allegation that the Objectiva Architecture was "never . . . marketed, sold, or distributed," is well taken, this allegation alone does not merit a Rule 12 dismissal for failure to plead a trade secret. *Id.*, ¶ 7. IBM also argues Sisoian has "abandoned" the Objectiva Architecture and "even if it was a trade secret at some point, he cannot plausibly allege that the program remains a trade secret under Texas law 15 years after he last used it in his business." *See* Reply [#41], at 18–19. Sisoian, however, has alleged the original misappropriation occurred somewhere between 2001 and 2004, and so it is during this time frame that the Objectiva Architecture's trade secret status is most relevant, not whether it is a trade secret still today.

In sum, the Court finds Sisoian has adequately alleged the Objectiva Architecture to be a trade secret. Moreover, the comparative evaluation of all of the relevant trade secret factors provided by the Texas Supreme Court would be more appropriately handled on a full evidentiary record at a later stage of the litigation.

## Conclusion

A Rule 12(b)(6) motion requires the Court to examine the pleadings and accept as true the plaintiff's factual allegations. In this order, the Court has answered some legal questions. For instance, the Court determined the relevant statutes of limitations for the claims asserted and whether

the discovery rule applies to those claims. The Court has also addressed factual questions, and, construing the alleged facts in Sisoian's favor, concluded his Amended Complaint satisfies the Supreme Court's Rule 12(b)(6) standards described in *Iqbal* and *Twombly*. For example, these factual questions include: (1) the scope of Hartmann's authority and whether he acted outside this scope when he provided Anderson with the Objective Architecture; (2) whether Sisoian should have discovered, with the exercise of reasonable diligence, the facts giving rise to his claims sooner than December 1, 2010; and (3) whether the Objectiva Architecture constitutes a trade secret. Ultimately, these factual questions will turn on the evidence admitted at trial and the determinations of the jury. They will not depend on the Court's conclusions in this order. With this procedural posture firmly in mind, the Court summarizes its determinations concerning the instant motion to dismiss.

The relevant statutes of limitations for the four causes of action at issue are as follows: (1) common law trade secret misappropriation—three years; (2) TTLA theft of trade secret—three years; (3) breach of fiduciary duty—four years; and (4) conspiracy—two years. The discovery rule applies to all of these claims. Because Hartmann's knowledge is not imputed to Sisoian and because Sisoian has adequately pleaded he could not have known, with the exercise of reasonable diligence, of the facts giving rise to his claims earlier than December 1, 2010, the Court accepts this date as the triggering date for the relevant limitations periods. Therefore, Sisoian's lawsuit, filed on April 18, 2013, is timely with respect to common law trade secret misappropriation, TTLA theft of trade secret, and breach of fiduciary duty. The conspiracy claim, however, is time-barred, and the motion to dismiss is GRANTED only with respect to this claim. Otherwise, the motion is DENIED as Sisoian has adequately pleaded his causes of action to satisfy Rule 12(b)(6).

Accordingly,

IT IS ORDERED that Defendant International Business Machines Corporation's Motion to Dismiss [#38] is DENIED IN PART and GRANTED IN PART, as described in this opinion;

IT IS FINALLY ORDERED that Plaintiff Thomas C. Sisoian's conspiracy claim against Defendant International Business Machines Corporation is DISMISSED WITH PREJUDICE as time-barred.

SIGNED this the ___18___ day of August 2014.

_____
SAM SPARKS
UNITED STATES DISTRICT JUDGE