IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| THOMAS C. SISOIAN | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No.: A-14-CA-565-SS |
| | § | |
| INTERNATIONAL BUSINESS | § | |
| MACHINES CORPORATION, | § | |
| | § | |
| Defendant. | § | |

**DEFENDANT IBM'S MOTION FOR SUMMARY JUDGMENT**

R. Paul Yetter
Collin J. Cox
YETTER COLEMAN LLP
909 Fannin, Suite 3600
Houston, Texas 77010

July 28, 2017

ATTORNEYS FOR DEFENDANT
INTERNATIONAL BUSINESS MACHINES
CORPORATION

# TABLE OF CONTENTS

Factual Background ........................................................................................................... 1

I.      The Innoverse Source Code Was Developed Long Before Objectiva Architecture........... 1

II.     Sisoian Formed Objectiva Innovations and Continued the Same Work............................ 2

III.    The Objectiva Architecture Was Made Public and Provided to Third Parties With
        No Confidentiality Obligations................................................................................... 4

IV.     Anderson's Work on the Objectiva Architecture Continued Long After Any
        Employment With Objectiva Ended. ........................................................................... 5

V.      Sisoian Did Not Take Reasonable Steps to Protect the Objectiva Architecture
        From Disclosure......................................................................................................... 5

VI.     Sisoian Was on Notice of His Claims Long Before He Sued IBM. ................................ 6

Governing Legal Standards................................................................................................ 8

Argument and Authorities.................................................................................................. 9

I.      All of Sisoian's Claims Are Barred by Limitations........................................................ 9

        A.      All Limitations Periods Have Expired.................................................................. 9

        B.      The Discovery Rule Defers Accrual Only Until a Plaintiff Knows or Should
                Know of Facts Giving Rise to Its Claim. ......................................................... 10

        C.      Plaintiff Was on Inquiry Notice of His Claims by 2007...................................... 10

II.     Sisoian Does Not Own Any Trade Secret.................................................................... 11

        A.      The Objectiva Architecture Is a Joint Work Co-Owned by Anderson. ................ 11

        B.      Sisoian Cannot Own Portions of the Objectiva Architecture Written After
                Anderson Was No Longer Employed by Objectiva Innovations.......................... 13

        C.      Sisoian Has Not Identified any Objectiva "Know-How" That He Could Own.... 14

III.    Sisoian Cannot Meet Other Elements of Misappropriation............................................ 15

        A.      Sisoian Cannot Prove the Existence of a Trade Secret. ...................................... 15

        B.      Objectiva Architecture Is Not a Trade Secret. ................................................... 16

        C.      IBM Did Not Have Actual Or Constructive Notice of Any Alleged Breach of
                Duty by Anderson. ......................................................................................... 18

Conclusion and Prayer ............................................................................................................... 20

Certificate of Service ................................................................................................................ 21

## TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Aalmuhammed v. Lee,*
    202 F.3d 1227 (9th Cir. 2000) ................................................................................12

*Alcatel USA, Inc. v. Cisco Sys., Inc.,*
    239 F. Supp. 2d 645 (E.D. Tex. 2002) ...................................................................11

*Applogix Dev. Group, Inc. v. Dallas Cent. Appraisal Dist.,*
    2006 WL 2482958 (N.D. Tex. 2006) ................................................................11, 14

*Childress v. Taylor,*
    945 F.2d 500 (2d Cir. 1991) ...................................................................................13

*Clogston v. Am. Academy of Orthopedic Surgeons,*
    930 F. Supp. 1156 (W.D. Tex. 1996) .....................................................................12

*Community for Creative Non-Violence v. Reid,*
    490 U.S. 730 (1989) .................................................................................................13

*Complete Pharmacy Res., Ltd. v. Feltman,*
    2005 WL 1949540 (S.D. Tex. Aug. 12, 2005) .......................................................11

*Computer Mgmt. Assistance Co. v. Robert F. DeCastro, Inc.,*
    220 F.3d 396 (5th Cir. 2000) ..................................................................................11

*Cooley v. Penguin Group (USA) Inc.,*
    31 F. Supp. 3d 599 (S.D.N.Y. 2014) ......................................................................13

*E.I. DuPont deNemours & Co. v. Christopher,*
    431 F.2d 1012 (5th Cir. 1970) ................................................................................18

*Gaia Techs. Inc. v. Recycled Products Corp.,*
    175 F.3d 365 (5th Cir. 1999) ..................................................................................11

*Imax Corp. v. Cinema Techs., Inc.,*
    152 F.3d 1161 (9th Cir. 1998) ............................................................................8, 15

*Interox Am. v. PPG Industries, Inc.,*
    736 F.2d 194 (5th Cir. 1984) ..................................................................................17

*Meadows v. Hartford Life Ins. Co.,*
    492 F.3d 634 (5th Cir. 2007) ..................................................................................20

*Metallurgical Indus., Inc. v. Fourtek, Inc.*,
    790 F.2d 1195 (5th Cir. 1986) ...............................................................................19

*Phillips v. Frey*,
    20 F.3d 623 (5th Cir. 1994) ........................................................................8, 15, 18

*Priester v. JP Morgan Chase Bank, N.A.*,
    708 F.3d 667 (5th Cir. 2013) ..................................................................................10

*Pringle v. Schleuter*,
    388 F. App'x. 449 (5th Cir. 2010) ............................................................................9

*Reinsdorf v. Skechers U.S.A.*,
    922 F. Supp. 2d 866 (C.D. Cal. 2013) ...................................................................12

*Seatrax, Inc. v. Sonbeck Int'l, Inc.*,
    200 F.3d 358 (5th Cir. 2000) ....................................................................................9

*Tewari De-Ox Sys., Inc. v. Mountain States/Rosen*,
    637 F.3d 604 (5th Cir. 2011) ..................................................................................16

*In re TXCO Resources, Inc.*,
    475 B.R. 781 (W.D. Tex. 2012)...............................................................................16

*United Servs. Auto. Ass'n (USAA) v. Mitek Sys., Inc.*,
    289 F.R.D. 244 (W.D. Tex. 2013), *aff'd*, 2013 WL 1867417 (W.D. Tex. 2013)....................9

*Weissmann v. Freeman*,
    868 F.2d 1313 (2d Cir. 1989)............................................................................11, 12

*Zuilli v. Shanahan*,
    80 F.3d 1366 (9th Cir. 1996) ..................................................................................13

**State Cases**

*In re Bass*,
    113 S.W.3d 735 (Tex. 2003)....................................................................................16

*Doe v. Roman Catholic Archdiocese of Galveston-Houston*,
    362 S.W.3d 803 (Tex. App.—Houston [14th Dist.] 2012, no pet.)........................10

*Global Water Group, Inc. v. Atchley*,
    244 S.W.3d 924 (Tex. App.—Dallas 2008, pet. denied)........................................18

*J.C. Kinley Co. v. Haynie Wire Line Serv. Inc.*,
    705 S.W.2d 193 (Tex. App.—Houston 1985, writ ref'd n.r.e.)..............................17

*Luccous v. J. C. Kinley Co.*,
    376 S.W.2d 336 (Tex. 1964)....................................................................................16

*M.N. Dannenbaum v. Brummerhop*,
    840 S.W.2d 624 (Tex. App.—Houston [14th Dist.] 1992, writ denied)..................................14

*Rugen v. Interactive Bus. Sys. Inc.*,
    864 S.W.2d 548 (Tex. App.—Dallas 1993, no writ) ................................................................17

**Federal Statutes**

17 U.S.C. § 101................................................................................................................11, 12, 13

17 U.S.C. § 102..............................................................................................................................11

17 U.S.C. § 201......................................................................................................................11, 13

**State Statutes**

TEX. CIV. PRAC. & REM. CODE § 16.004(a)(5) ..............................................................................9

TEX. CIV. PRAC. & REM. CODE § 16.010(a) ..................................................................................9

**Rules**

FED. R. CIV. P. 56(a) ......................................................................................................................8

**Other Authorities**

Restatement (Third) of Unfair Competition § 43 (1995)..............................................................18

After years of litigation, no reasonable jury could find for Sisoian on his claims for trade secret misappropriation or breach of fiduciary duty, as he has failed to establish the requisite elements. He has not established that he owns the Objectiva Architecture, that it is or contains a trade secret, or that IBM acquired it through improper means or the breach of a duty owed to him. Consequently, IBM is entitled to summary judgement.

Sisoian claims that he is the owner of a trade secret that consists of the entirety of (i) the software, source code, and related "know-how" of a computer program called the Objectiva Architecture as it existed at the dissolution of his company, Objectiva Innovations, on October 23, 2000; and (ii) the software, source code, and related "know-how" of source code written by Francis Anderson after he was employed by IBM on September 1, 1999. Sisoian alleges that Anderson used the Objectiva Architecture to develop portions of the IBM Websphere Telecom Content Pack ("Telco Pack").[1] But the Telco Pack and the Objectiva Architecture could hardly be more different. The Objectiva Architecture is allegedly executable code that contains a DME (Domain Model Engine), performs a host of functions, and includes a catalog modeling tool; the Telco Pack does not contain executable code, has no DME, performs no functions and cannot be used to model catalogs. Moreover, there is no allegation that any Objectiva Architecture source code was copied into or otherwise exists in the source code for the Telco Pack.

## FACTUAL BACKGROUND

### I.    The Innoverse Source Code Was Developed Long Before Objectiva Architecture.

In the early 1990s, eight men worked (with others) on developing "object-oriented" software programs and technology at Sprint Corporation, including Sisoian, Anderson, and James Hartmann. Ex. 1 (TSIS602). In 1995, they moved together to ClearSystems, Inc., where

---

[1] This product is known within IBM by several names: WTCP, Telecom Operations Content Pack ("TOCP"), Telco Content Pack, or simply Telco Pack. *See* Ex. 2 (Anderson Depo. at 108:15-19) ("It went from TOCP to WTCP to I think TCAP came in there one time.").

they worked on a software product called "Innoverse." It was an object-oriented program built on an "adaptive object model architecture," and was designed to integrate different telecommunications billing-related services into one system that could accommodate changes to a telecom company's products and services. Ex. 3 (Earle Declaration) at ¶ 3; Ex. 2 (Anderson Depo.) at 127:15-129:21; Ex. 4 (*Innoverse*, by Ralph Johnson). Innoverse was largely coded by Anderson. Ex. 3 (Earle Declaration) at ¶ 5. ClearSystems was successful in licensing Innoverse to customers and was working to improve the program's scalability at the time Sisoian left the company. Ex. 5 (Fowler Depo.) at 15:18-16:6; Ex. 6 (Yoder Depo.) at 49:4-51:22.

## II.    Sisoian Formed Objectiva Innovations and Continued the Same Work.

In 1997, Sisoian left ClearSystems to form a company called "Objectiva Innovations, Inc.," which was incorporated on September 15, 1997. The other seven men from Sprint and ClearSystems joined him. They focused on what they knew: building an adaptive object model billing system for the telecom industry, called the Objectiva Architecture. Anderson, the principle author of the Objectiva Architecture, described it as the next iteration of Innoverse. Ex. 2 (Anderson Depo.) at 130:23-131:19. Sisoian wrote none of the code.[2]

As shown in previous filings, much of the Objectiva Architecture source code is identical to the Innoverse source code previously created at ClearSystems. *See* Dkt. #150 at 7-8, 10-13. Sisoian's own expert, Kevin Almeroth, admits that over 20% of the Objectiva source code is *identical* to Innoverse code. *See* Ex. 7 (Almeroth Seventh Expert Report 2017-07-05) at ¶¶ 7, 12-18 (determining that 7,883 lines of code out of a 37,108 lines are identical). Likewise, Anderson's presentations on Innoverse and the Objectiva Architecture and the Johnson

---

[2] Patel, Nielsen, and Hemmi testified that for a brief period of time they also wrote small amounts of source code pertaining to the graphical user interface and distributed architecture. The Telco Pack has neither a graphical user interface nor a distributed architecture, and any contributions by Patel, Nielsen, and Hemmi are not relevant to IBM's alleged misappropriation.

Innoverse and Objectiva papers make clear the two programs' similar purposes and functions. *Compare, e.g.*, Ex. 4 (Innoverse paper) at Johnson000002 *with* Ex. 8 (R. Johnson & F. Anderson, *The Objectiva Architecture*, IBM0384008) at 09; *compare, e.g.*, Ex. 9 (Innoverse presentation) at ClearSystems0000002, 06-07, 19-20, *with* Ex. 10 TSIS00000910, 14-16, 22, 24 (Objectiva presentation). Innoverse and Objectiva share the same programming language (Smalltalk), configuration management system, and programming tools (VisualWorks and ENVY/Manager). Ex. 2 (Anderson Depo.) at 130:1-134:12. Indeed, Objectiva was intended to do what Innoverse did, with a couple of additions that are irrelevant to this lawsuit.

Objectiva Innovations failed quickly. Formed in September 1997, it never sold anything, never generated any revenue, and was formally dissolved by October 23, 2000. But the company was shelved well before then. It had failed discussions with Lucent (to whom the company unsuccessfully tried to sell the Objectiva Architecture). Ex. 11 (MILES00024-25). Many workers left the company and took jobs within months of starting at Objectiva. Ex. 2 (Anderson Depo.) at 267:21-268:3; Ex. 12 (Patel Depo.) at 23:15-23; Ex. 13 (Hartmann Depo.) at 52:24-53:1. Indeed, in March 1998, Sisoian himself went to work for IBM and stated that his employment with Objectiva Innovations officially had ended. Ex. 14 (Sisoian Depo. (Vol. I)) at 15:8-14.[3] Objectiva Innovation's tax filings (executed by Sisoian) state that Objectiva Innovations had no revenue, no profits, no employees, and no assets by the end of 1999; that remained so going forward. Ex. 15 (Del. Franchise Tax Returns). According to Sisoian, Anderson left Objectiva in September 1999. At that point, there was no one left working for Objectiva. Ex. 14 (Sisoian Depo. (Vol. I)) at 78:7-15.

---

[3] Although Sisoian identified the Objectiva Architecture as third-party property, he never provided an identification or description of what it was to IBM. Ex. 14 (Sisoian Depo. (Vol. I)) at 222:24-224:1, 224:17-229:23.

During the few months of Objectiva Innovations' operations, Sisoian did not pay any of its "employees."[4] Ex. 2 (Anderson Depo.) at 38:15-39:15; Ex. 12 (Patel Depo.) at 35:7-9. To support himself, Anderson relied upon an inheritance. Ex. 2 (Anderson Depo.) at 145:16-146:9.

### III.  The Objectiva Architecture Was Made Public and Provided to Third Parties With No Confidentiality Obligations.

A substantial amount, and perhaps all, of the Objectiva Architecture was made public long ago. Anderson (with Sisoian's knowledge and consent) wrote papers about the software that were available on the Internet and included in a book. Ex. 2 (Anderson Depo.) at 212:1-214:8. In 1998, Anderson presented on the Objectiva Architecture at the MetaData Pattern Mining Workshop at the University of Illinois. In preparing for his talk, he sent "the latest Objectiva [Architecture source] code" to the conference hosts, Ex 16 (Ex. A to Yoder Declaration), who had no confidentiality or other obligations to Objectiva Innovations or Sisoian. One of those recipients, Joseph Yoder, testified that no one from Objectiva ever sought to have the source code (or anything else Anderson sent) returned, and that he has kept a copy of the source code in his own files for the last nineteen years. Ex. 6 (Yoder Depo.) at 248:4-14, 249:21-250:4.

At the conference, Anderson showed conference participants portions of the Objectiva source code. Ex. 2 (Anderson Depo.) at 224:5-226:13. He never asked anyone to keep his talk or the code secret. Ex. 17 (Yoder Decl.) ¶ 6; Ex. 6 (Yoder Depo.) at 230:17-231:7, 255:2-256:7. Sisoian knew Anderson was presenting at the conference and saw his paper in advance. Ex. 14 (Sisoian Depo. (Vol. I)) at 97:12-99:7.

---

[4] Although IBM disputes that any of the men were "employees," for this motion, IBM considers them employees for the periods claimed by Sisoian. For example, Sisoian claimed that Anderson was an Objectiva Innovations employee until September 1999. Ex. 14 (Sisoian Depo. (Vol. I)) at 78:7-15.

IV.    **Anderson's Work on the Objectiva Architecture Continued Long After Any Employment With Objectiva Ended.**

After leaving Objectiva Innovations, Anderson continued to write source code for the Objectiva Architecture, with Sisoian's knowledge and consent until about August 2000. Then he and Sisoian ceased attempting to sell the Objectiva Architecture to IBM. Anderson testified that he continued his work because he and Sisoian were partners – joint owners of the technology – and he hoped to profit from it. Ex. 2 (Anderson Depo.) at 144:8-145:8, 279:4-282:13.

V.    **Sisoian Did Not Take Reasonable Steps to Protect the Objectiva Architecture From Disclosure.**

Sisoian did not reasonably protect the Objectiva Architecture. He has testified that he ensured that no one but he had any Objectiva source code after September 1999, and that his copies – the only copies in existence – were lost in 2010. Ex. 14 (Sisoian Depo. (Vol. I)) at 156:16-157:20. Thus, to Sisoian's knowledge, there was no Objectiva code in existence after 2010. But the evidence shows otherwise.

**Hartmann Source Code.** Hartmann had his own copies of the code, which he says had been in his possession since 1998, on the hard drive of a computer sold to him by Sisoian when Objectiva Innovations folded. Ex. 13 (Hartmann Depo.) at 55:14-16, 56:8-25. Sisoian denies giving him permission to possess the source code when he left Objectiva, or anytime thereafter, and claims to have no knowledge as to how Hartmann came to possess the code. Ex. 14 (Sisoian Depo. (Vol. I)) at 107:24-108:5, 113:11-13. Nonetheless, he approached Hartmann in 2012 and asked him for a copy. What he received from Hartmann is the first version produced by Sisoian in this case (the "Sisoian Production"). Despite many social visits over years, Sisoian never asked or learned that Hartmann had the code. Inexplicably, Hartmann later provided Sisoian with a copy of a different version of the source code, which Sisoian also produced in this case (the "Hartmann Production"). The Hartmann Production includes code written as late as May 2000,

which calls into question both Hartmann's story as to when he took possession of it, and highlights Sisoian's complete lack of knowledge of its existence and how Hartmann acquired it. This from the man claiming a valuable trade secret.

**Anderson Source Code.** Anderson "always" had the Objectiva Architecture source code in his possession. Ex. 2 (Anderson Depo.) at 66:19-67:11. Ex. 2 (Anderson Depo.) at 44:1-24. Thereafter, Sisoian never took action to repossess or otherwise protect the source code in Anderson's possession. Ex. 2 (Anderson Depo.) at 173:25-175:13.

**Yoder Source Code.** Likewise, Joseph Yoder, the conference organizer, retained his copy of Objectiva Architecture source code after 1998 for nearly twenty years, with no restrictions on his use or disclosure of the technology. Ex. 6 (Yoder Depo.) at 243:25-14, 249:21-250:17.

**Lack of Sisoian Source Code.** As for his own copies, Sisoian has testified that in 2010 his son broke into his home office and took and lost (or destroyed) nearly every hardcopy Objectiva file and the only copies of the source code. Ex. 14 (Sisoian Depo. (Vol. I)) at 149:17-150:20. He claims his son lost the files in a nearby Austin forest. *Id.* at 151:5-52:21. He did not tell the police or report in writing that the files were taken. *Id.* at 155:5-157:2. Nor had Sisoian taken the obvious, simple, and inexpensive step to maintain a backup copy of the Objectiva Architecture. *Id.* at 77:13-78:6. Thus, Sisoian failed to preserve the very existence of the Objectiva Architecture.

## VI.    Sisoian Was on Notice of His Claims Long Before He Sued IBM.

Despite not preserving the existence of his alleged trade secret or its disclosure to third parties, Sisoian sued IBM in April 2013 (seven years after IBM began offering the Telco Pack) alleging misappropriation and breach of fiduciary duty. But the evidence shows that he was on actual or constructive notice of the claims years before filing suit.

To avoid a limitations bar, Sisoian claims that he had no idea of his potential claims until December 1, 2010, when Gugliotta sent him an email describing IBM's BPM and Telco Pack as "dynamic."[5] Ex. 14 (Sisoian Depo. (Vol. I)) at 204:10-25 ("Dynamic was the thing that caught my attention."), 207:4-7 ("Q: And that single word [dynamic] in this entire description is the only thing that caused you to wonder? A: That word is the main word that caused me to wonder."). But the email contains nothing more than a description of an IBM telecom product demonstration, which is "implemented with IBM Dynamic BPM and *Telco Pack*." Ex. 18 (SisoianLaptop0169795) (emph. added). The description is neither unique nor different from other emails received by Sisoian long before 2010, which all discussed the Telco Pack.

References to IBM's "dynamic" offerings. Sisoian had previously received many emails referencing a "dynamic" IBM telecom product. *E.g.*, Ex. 19 (SisoianLaptop0034757) (6/6/2008 email highlighting "dynamic BPM" as "IBM's competitive differentiator"); Ex. 20 (SisoianLaptop0040044) (4/9/2008 email with headline about "Dynamic BPM"); Ex. 21 (SisoianLaptop0087876) (3/11/2010 email discussing "dynamic BPM" in the context of IBM Industry Frameworks, including the telecommunications industry). If the word "dynamic" was so critical, each of these communications started the limitations period.

The November 1, 2007 email. Moreover, three years earlier, on November 1, 2007, Gugliotta emailed Anderson and others in IBM's telecom sector asking them to prepare an "internal industry win flash" to alert IBM colleagues about a successful "sales effort for WBS Fabric and Telco Content Pack at AT&T." Ex. 22 (SisoianLaptop0119335). Besides mentioning the Telco Content Pack by name, he also referred to the TOCP. *Id.* And he sent a copy to

---

[5]   Although not an Objectiva Innovations employee, Gugliotta was a deeply involved consultant/independent contractor for the company.

Sisoian. *Id*. In other words, more than six years before filing suit, Sisoian received an email from the same sender as the supposedly critical December 1, 2010 email, about the same product.

These emails and others received by Sisoian putting him on notice of his claims are detailed in IBM's prior briefing on limitations, which is incorporated here by reference. *See* Dkt. #124. Although Sisoian denies actually reading these emails in an effort to avoid a limitations bar (a dubious allegation to which IBM stipulates only for purposes of this motion), his failure to do so was unreasonable given the details provided about the Telco Pack and Sisoian's obligations to protect his alleged trade secret.

In addition to the emails addressed above, Sisoian should have learned of his claims through his meetings and other communications he had with Hartmann years before 2010, including discussions specifically about Objectiva Innovations and the Objectiva Architecture. For example, Sisoian admits that he had "meetings with Hartmann in Amsterdam in October 2004." Ex. 23 (Sisoian's Answers to IBM First Set of Interrogatories, No. 8) at 6-7. In fact, there were two meetings that month, and in one, he said he told Hartmann that he had tried but failed to license the Objectiva Architecture to IBM Tivoli in 2000. *Id*. at 5. For a decade, Sisoian had every opportunity to ask his friend about the Objectiva Architecture copy and to discuss friends and former colleagues, such as Anderson. Dkt. #190 at ¶¶ 15-17.

**GOVERNING LEGAL STANDARDS**

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Misappropriation requires the existence of a trade secret; acquiring it through breach of a confidential relationship or discovery by improper means; and using it without authorization. *Phillips v. Frey*, 20 F.3d 623, 627 (5th Cir. 1994). To prevail, Sisoian must first "identify [his] trade secrets and carry the burden of showing that they exist." *See Imax Corp. v. Cinema Techs.,*

-8-

*Inc.*, 152 F.3d 1161, 1164 (9th Cir. 1998). In identifying the trade secrets at issue, Sisoian must provide each a description that differentiates them from publicly available information. *United Servs. Auto. Ass'n (USAA) v. Mitek Sys., Inc.*, 289 F.R.D. 244, 249 (W.D. Tex. 2013), *aff'd*, 2013 WL 1867417 (W.D. Tex. 2013). Sisoian has failed to meet his burden.

### ARGUMENT AND AUTHORITIES

**I.   All of Sisoian's Claims Are Barred by Limitations.**

**A.   All Limitations Periods Have Expired.**

Where a plaintiff has reasonable opportunity to discover an alleged violation but takes no action within the relevant limitations period, summary judgment is appropriate. *Pringle v. Schleuter*, 388 F. App'x. 449, 450 (5th Cir. 2010). Sisoian's claims are subject to limitations periods of four years or less:

- Trade secret misappropriation: "not later than three years after the misappropriation is discovered or by the exercise of reasonable diligence should have been discovered." TEX. CIV. PRAC. & REM. CODE §16.010(a).

- Fiduciary duty claim: within four years of the day the cause of action accrues. TEX. CIV. PRAC. & REM. CODE §16.004(a)(5).

Sisoian filed suit on April 18, 2013. Dkt. #1. He alleges that Anderson procured a copy of Objectiva Architecture under false pretenses in 2001, and that he began using it at IBM in 2005 for catalog modeling and in 2006 to develop parts of the Telco Pack, which IBM began selling in 2006. Dkt. #190, 3d Am. Compl. at ¶¶ 10-12.

Absent the discovery rule, limitations began to run on these claims at the latest in 2007, at least six years before suit was filed. *See Seatrax, Inc. v. Sonbeck Int'l, Inc.*, 200 F.3d 358, 365 (5th Cir. 2000) ("A cause of action for a misappropriation of trade secrets accrues when the trade secret is actually used.") (cite omitted). The only dispute is whether the discovery rule should toll limitations until December 1, 2010, the date Sisoian alleges he first learned of IBM's Telco Pack.

**B.** **The Discovery Rule Defers Accrual Only Until a Plaintiff Knows or Should Know of Facts Giving Rise to Its Claim.**

The discovery rule "operates to defer accrual of a cause of action until the plaintiff knows or, by exercising reasonable diligence, should know of the facts giving rise to the claim." *Priester v. JP Morgan Chase Bank, N.A.*, 708 F.3d 667, 675 (5th Cir. 2013) (quotes omitted). Mere inquiry notice is enough to start the clock: knowledge of facts that would make a reasonably prudent person "inquire about his rights." *Doe v. Roman Catholic Archdiocese of Galveston-Houston*, 362 S.W.3d 803, 814 (Tex. App.—Houston [14th Dist.] 2012, no pet.).

**C.** **Plaintiff Was on Inquiry Notice of His Claims by 2007.**

By November 2007, Sisoian had ample actual and constructive notice of the facts that underlie his claims. In 2004-06 he spoke repeatedly to Hartmann, the person who Sisoian alleges gave a copy of the Objectiva Architecture to Anderson, and to whom Sisoian specifically discussed his attempts to sell the Objectiva Architecture to IBM. Moreover, he received notice from a friend in 2007 that IBM sold the Telco Pack, the product he claims misappropriates his trade secrets. He received regular emails in 2007-08 detailing IBM's telecom offerings with "flexible architecture" that tracks and manages business processes. He could not reasonably be "oblivious" to these facts until 2010. *See Doe*, 362 S.W.3d at 814.

At the latest, the discovery rule ceased to toll limitations by 2008, and when Sisoian finally sued IBM five years later, all his claims were time-barred. IBM is thus entitled to summary judgment. Sisoian's claim that he did not and could not discover the Telco Pack and its supposed similarity to Objectiva Architecture earlier than December 2010 is utterly contrary to the facts.

-10-

## II.       Sisoian Does Not Own Any Trade Secret.

In order to establish misappropriation, Sisoian must own the alleged trade secret. *Gaia Techs. Inc. v. Recycled Products Corp.*, 175 F.3d 365, 376 (5th Cir. 1999) (orig. emph.). With respect to the source code, although his claims are grounded in state law, the analysis turns on ownership under the Copyright Act. *See* 17 U.S.C. § 102(a)(1) (computer programs protected as "literary works"); *Computer Mgmt. Assistance Co. v. Robert F. DeCastro, Inc.*, 220 F.3d 396, 400 (5th Cir. 2000) (computer programs entitled to copyright protection). Source code ownership presents a question of law. *Alcatel USA, Inc. v. Cisco Sys., Inc.*, 239 F. Supp. 2d 645, 657-58 (E.D. Tex. 2002) (deciding issues of ownership of a computer program on summary judgment).

In the case of computer software, a plaintiff does not own a trade secret in software unless he alone owns the copyright in that software. *Applogix Dev. Group, Inc. v. Dallas Cent. Appraisal Dist.*, 2006 WL 2482958, at *5 (N.D. Tex. 2006) (plaintiff could not own "a trade secret in MARS source code, because all rights to MARS are owned by [defendant]"). Thus, where another owns the "'exclusive rights' under copyright law" to a computer program, a plaintiff cannot prevail on a misappropriation claim. *Complet*e *Pharmacy Res., Ltd. v. Feltman*, 2005 WL 1949540, at *6 (S.D. Tex. Aug. 12, 2005). Here, the undisputed evidence refutes any claim that Sisoian alone owns the alleged trade-secret software.

### A.       The Objectiva Architecture Is a Joint Work Co-Owned by Anderson.

Copyright ownership normally vests in the author of a work and extends only to those works that are "original." 17 U.S.C. § 201(a). But where two or more authors contribute works of authorship to be "merged into inseparable or interdependent parts of a unitary whole," the work is a joint work and is co-owned by those authors. 17 U.S.C. §§ 101, 201(a). "In a joint work each author automatically acquires an undivided ownership in the entire work including any portion of it." *Weissmann v. Freeman*, 868 F.2d 1313, 1318 (2d Cir. 1989). Thus, a co-

-11-

author cannot be found to have infringed or misappropriated a trade secret in the work because he cannot misappropriate his own trade secret. *See id.*

To be a joint work, the co-authors must intend that their respective contributions will be merged together. 17 U.S.C. §101. The intent to create a joint work does not have to be explicitly stated. Whether the requisite intent exists is inferred from objective facts that reasonably show whether each author meant for his contribution to be combined with the other's. *Aalmuhammed v. Lee*, 202 F.3d 1227, 1234 (9th Cir. 2000); *Clogston v. Am. Academy of Orthopedic Surgeons*, 930 F. Supp. 1156, 1159 (W.D. Tex. 1996). Among the objective factors to be considered in determining whether an author had the requisite intent are (i) the extent of one's decision making authority about what to include in the work; (ii) whether one is billed as an author; (iii) the parties' agreements with third parties; and (iv) whether one was paid by the other for his contribution. *Id.* Moreover, where one author facilitates the other's work and its integration into the merged work, the intent to create a joint work is inferred. *Reinsdorf v. Skechers U.S.A.*, 922 F. Supp. 2d 866, 873-74 (C.D. Cal. 2013).

The undisputed facts show that Anderson wrote substantial and independently copyrightable Objectiva Architecture source code after August of 1999[6] (the time Sisoian alleges Anderson's employment ended), and that he did so with Sisoian's knowledge and consent. Ex. 2 (Anderson Depo.) at 138:23-139:22, 279:4-282:13. This was done in order to combine that source code with the then existing source code in order to create and enhance a single work known as the Objectiva Architecture. Ex.2 (Anderson Depo.) at 44:1-24, 60:19-64:23. Anderson controlled the content of his post-Objectiva Innovations work and was not paid for it. Anderson

---

[6] Between September 1, 1999 and May 30, 2000, Anderson added nearly 91 new classes, including nearly 7,000 lines of code, and modified 153 additional classes. Ex. 24 (Hicks Rebuttal Report of 2017-04-13) at ¶7.

undertook these efforts because he thought he and Sisoian were "partners" and that he would share in any proceeds attributable to the Objectiva Architecture. Indeed, the two men collaborated and tried to sell that enhanced single work to IBM up until August 2000. *Id.* at 197:3-22. Both intended Anderson's later work to be integrated with the older source code, making it inseparable, interdependent, and part of a single inseparable work, the Objectiva Architecture. 17 U.S.C. §§ 101, 201(a); *Childress v. Taylor*, 945 F.2d 500, 504 (2d Cir. 1991). Thus as of September 1999, the whole of Objectiva Architecture was jointly owned by Sisoian and Anderson, with Anderson free to use and disclose it, including at IBM. *See Zuilli v. Shanahan*, 80 F.3d 1366 (9th Cir. 1996) ("[A] co-owner is an owner, he has a right to use or license the use of the copyright, and cannot be an infringer . . . .").

**B.      Sisoian Cannot Own Portions of the Objectiva Architecture Written After Anderson Was No Longer Employed by Objectiva Innovations.**

Even if the Objectiva Architecture is not a joint work, Sisoian does not own the portions of the code written after August 1999, which is when Sisoian says Anderson's employment with Objectiva Innovations ended. This is because once no longer employed by Objectiva, Anderson's work could no longer be deemed a work for hire; he was no longer an employee. There is no allegation (let alone proof) of any written agreement by which Anderson agreed that the post-1999 code would be a work for hire. *See Community for Creative Non-Violence v. Reid*, 490 U.S. 730, 736 (1989). Moreover, copyright ownership extends only to an author's "original" works, not to later works written by another, even if such later works are derivative works of the original. *See Cooley v. Penguin Group (USA) Inc.*, 31 F. Supp. 3d 599, 608-09 (S.D.N.Y. 2014) (explaining that rights in the underlying work are not expanded by a derivative work).

At best, Sisoian owns only the source code written during Anderson's Objectiva Innovations employment, which Sisoian testified ended by September 1999. 17 U.S.C. §§101,

201(a), (b) (vesting ownership in a "work for hire" in employer for works "prepared by an employee within the scope of his or her employment"). Sisoian does not contend that Anderson worked at Objectiva after September 1999. Ex. 2 (Sisoian Depo. (Vol. I)) at 78:7-15. But Sisoian claims Anderson misappropriated the code from the Hartmann Production, which includes Anderson's contributions through 2000. Ex. 25 (Easttom Depo.) at 265:10-22. This includes years of Anderson's post-Objectiva Innovations development, creating substantial new aspects of the program. As a matter of law, Sisoian cannot be deemed to "own" these portions of the code, nor can Anderson's later work be part of any misappropriation. Without proof of ownership, Sisoian's misappropriation claim fails.

**C.      Sisoian Has Not Identified Any Objectiva "Know-How" That He Could Own.**

Sisoian also accuses IBM of misappropriating "know-how" relating to the Objectiva Architecture's software and source code. Ex. 25 (Easttom Depo.) at 44:4-23; Ex. 26 (Almeroth 2017-07-07 (Rough) Depo.) at 106:13-107:3. There is no doubt that Anderson was quite experienced and knowledgeable in the Smalltalk programming language, object-oriented programming, AOM, telecom company products and services, and catalog modeling. Ex. 2 (Anderson Depo.) at 120:9-121:1, 122:12-124:13, 213:6-214:8, 215:15-219:12. Nor is it disputed that Anderson used that knowledge and experience while employed at Objectiva Innovations.

But it is well established that the general skills, knowledge and experience an employee brings to a job, as well as that which he acquires as part of his job, are not trade secrets. *Applogix Dev. Group, Inc. v. Dallas Cent. Appraisal Dist*., 2006 WL 2482958, at *5 (N.D. Tex. Aug. 29, 2006); *M.N. Dannenbaum v. Brummerhop*, 840 S.W.2d 624, 631-32 (Tex. App.—Houston [14th Dist.] 1992, writ denied) (personal "efficiency, inventiveness, skills and experience which an employee develops through his work belong to him and not his former employer").

Sisoian alleges a trade secret in the "specific knowledge of the Objectiva System and its use," but has not identified any specific detail or analysis as to what that is. Indeed, neither of his experts provided any information regarding what the alleged "know-how" is, other than what are clearly Anderson's own knowledge, skill, and experience. They identified nothing Anderson learned during his brief tenure at Objectiva as opposed to his long career elsewhere, including at Sprint, ClearSystems, and IBM. *See* Dkt. #238 at 10; Dkt. #245 at 5-6. Indeed, Anderson's "know-how" was a career-long development, much of which was focused on developing and using software solutions for the telecommunications industry. As Anderson's undisputed testimony establishes, this began at Sprint in 1993, and continued at ClearSystems and later, albeit briefly, at Objectiva Innovations, and also at IBM. Ex. 2 (Anderson Depo.) at 120:9-121:1, 122:12-124:13, 213:6-214:8, 127:15-128:20. Sisoian cannot claim trade secret protection over the expertise Anderson acquired throughout his career.

## III.   Sisoian Cannot Meet Other Elements of Misappropriation.

Misappropriation requires the existence of a trade secret, acquiring it through breach of a confidential relationship or discovery by improper means, and using it without authorization. *Phillips v. Frey*, 20 F.3d 623, 627 (5th Cir. 1994).

### A.   Sisoian Cannot Prove the Existence of a Trade Secret.

To prevail, Sisoian must first "identify [his] trade secrets and carry the burden of showing that they exist." *See Imax Corp. v. Cinema Techs., Inc.*, 152 F.3d 1161, 1164-65 (9th Cir. 1998). This includes describing "the subject matter of the trade secret with *sufficient particularity* to separate it from matters of general knowledge in the trade or of special knowledge of those persons . . . skilled in the trade." *Id.* (emph. added). But Sisoian has not specifically identified any alleged trade secret nor shown that "it" is actually a trade secret that was misappropriated by IBM. Sisoian claims that the trade secret consists of the Objectiva Architecture source code, but

has not identified any particular portions of the source code as a trade secret and instead insist that the trade secret is all of the code taken as a whole. Ex. 25 (Easttom Depo.) at 52:4-53:10, 165:8-18, 197:3-20. However, much of the code is identical to the preexisting Innoverse source code, much has been distributed to third parties without restriction, much was written by Anderson when he was not an Objectiva employee, and some has been publicly disclosed in articles. Moreover, Sisoian has not proven that any remaining undifferentiated portion of source code – created over more than a decade – constitutes a trade secret as a matter of law.

**B.      Objectiva Architecture Is Not a Trade Secret.**

To determine whether something is a trade secret, a Texas court weighs six factors from the Restatement of Torts, "in the context of the surrounding circumstances":

(1) the extent to which the information is known outside of the business;

(2) the extent to which it is known by employees and others involved in the business;

(3) the extent of measures taken to guard the secrecy of the information;

(4) the value of the information to the business and to its competitors;

(5) the amount of effort or money expended in developing the information; [and]

(6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Tewari De-Ox Sys., Inc. v. Mountain States/Rosen*, 637 F.3d 604, 610 (5th Cir. 2011); *In re Bass*, 113 S.W.3d 735, 740 (Tex. 2003). Because "four of the six factors relate to the secrecy of the information, there must be a substantial amount of attendant secrecy for information to be a trade secret." *In re TXCO Resources, Inc.*, 475 B.R. 781, 804 (W.D. Tex. 2012); *see also Luccous v. J. C. Kinley Co.*, 376 S.W.2d 336, 338 (Tex. 1964) ("It is self-evident that the subject matter of a trade secret must be secret.").

**Sisoian failed to guard the secrecy of the Objectiva Architecture.** The undisputed evidence is that Objectiva Architecture was known outside of the company (factor 1), by Objectiva employees who took the technology with them when they left (factor 2), and that Sisoian did not take proper measures to guard its secrecy or protect it from disclosure (factor 3). To be protectable under the law, a trade secret must not be known by third parties or outside of the business in which it is created. *See Rugen v. Interactive Bus. Sys. Inc.*, 864 S.W.2d 548, 552 (Tex. App.—Dallas 1993, no writ). Thus, the owner must take reasonable precautions to protect the trade secret. *See J.C. Kinley Co. v. Haynie Wire Line Serv. Inc.*, 705 S.W.2d 193, 196–98 (Tex. App.—Houston 1985, writ ref'd n.r.e.). A person "who fails to take reasonable precautions to ensure its secrecy cannot properly claim that the information constitutes a trade secret." *Interox Am. v. PPG Industries, Inc.*, 736 F.2d 194, 202 (5th Cir. 1984). Sisoian failed to take reasonable precautions to protect Objectiva in several key respects:

First, Sisoian allowed Anderson to provide and present Objectiva Architecture source code to third party attendees of the 1998 University of Illinois conference. At the time, with Sisoian's knowledge and no confidentiality agreement, Anderson transmitted the "latest Objectiva code" to two persons with no connection to Objectiva Innovations, and other third-party participants at the conference had access to Objectiva Architecture source code.

Second, as discussed above, his former employees retained copies of the source code, long after their tenure with Objectiva Innovations ended. These are copies that were produced in this litigation (Sisoian having failed to preserve the existence of the copies he had).

Third, Sisoian failed to maintain a backup of the source code or make more than one copy – a simple, inexpensive protective step. Thus, when his son destroyed the copies that he retained (assuming the story's veracity), he no longer possessed any version of the software.[7]

The law requires vigilance. A trade-secret plaintiff must prove (among other things) that he did his best to maintain his secret. And beyond his conclusory arguments, Sisoian has not proven such vigilance or even identified what the remaining, secret source code even is.

C.    **IBM Did Not Have Actual Or Constructive Notice of Any Alleged Breach of Duty by Anderson.**

Likewise, as a matter of law, Sisoian cannot prove that his alleged trade secret "was acquired through a breach of a confidential relationship or discovered by improper means." *Phillips*, 20 F.3d at 627. Sisoian alleges that IBM acquired the Objectiva Architecture by "improper means" because Anderson used it at IBM, was not entitled to do so, and IBM "knew or reasonably should have known" this was a breach of duty to Objectiva Innovations. Dkt. #190 at ¶ 22. Sisoian can present no credible evidence to support this allegation.

**First**, to prove that IBM acquired a trade secret by improper means, Sisoian must present competent proof that IBM engaged in conduct that falls "below the generally accepted standards of commercial morality and reasonable conduct." *E.I. DuPont deNemours & Co. v. Christopher*, 431 F.2d 1012, 1016 (5th Cir. 1970). This includes "theft, fraud, unauthorized interception of communications, inducement of or knowing participation in a breach of confidence." Restatement (Third) of Unfair Competition § 43 (1995). There is no support for this theory.

---

[7] Moreover, Sisoian has not presented evidence (beyond merely conclusory statements) that shows how his alleged "secret" Objectiva source code had financial worth that provides a competitive advantage. *See Global Water Group, Inc. v. Atchley*, 244 S.W.3d 924, 929 (Tex. App.—Dallas 2008, pet. denied) (no trade secret where plaintiff presented "no evidence the formula itself was related to the success of the unit" and did not "explain how [its] formula . . . gave it a competitive advantage"). Sisoian relies on nothing more than Anderson's alleged use to show value, which is insufficient. *See id.* at 929 (granting JNOV of no trace secret because of lack of evidence of value and rejecting argument that the "formula was necessarily valuable" because it was used in a successful product).

-18-

**Second**, Sisoian cannot show knowledge by or notice to IBM that Anderson's disclosure of Objectiva Architecture breached a duty owed to Objectiva Innovations. To establish such knowledge, he must prove IBM knew or should have known about the alleged duty. *Metallurgical Indus., Inc. v. Fourtek, Inc.*, 790 F.2d 1195, 1204 (5th Cir. 1986). Conclusory allegations are insufficient. He must prove that IBM possessed information that would have put a reasonable person on notice:

> One has notice of facts under the rule stated in this Section when he knows of them or when he should know of them . . . . He should know of them if, from the information which he has, a reasonable man would infer the facts in question, or if, under the circumstances, a reasonable man would be put on inquiry and an inquiry pursued with reasonable intelligence and diligence would disclose the facts.

*Id.* (quoting Restatement (First) of Torts §757 (1939) and comment l).

There is no credible evidence that IBM engaged in wrongful conduct or was aware of any obligations of confidentiality that Anderson had to Objectiva Innovations or to Sisoian. While both men signed an Agreement Regarding Confidential Information, Intellectual Property, and Other Matters upon their employment at IBM, nothing in those documents provided IBM with any description of what the Objectiva Architecture was, that it constituted a trade secret, or that Sisoian claimed to own it. Ex. 27 (IBM Agreement). Sisoian identified Objectiva, Inc. as having an ownership interesting in the Objectiva Architecture; Anderson indicated "none" when asked if he had agreements with third parties regarding IP ownership. *Id.* Indeed, Sisoian never identified himself as the successor to Objectiva, Inc. or made a claim of ownership of the Objectiva Architecture to IBM until late 2011, when he first asked IBM to investigate its alleged misappropriation. Ex. 2 (Sisoian Depo. (Vol. I)) at 222:24-224:1, 224:17-229:23. And IBM never learned what Sisoian even believed the Objectiva Architecture to be until this lawsuit. Thus, to the extent that Anderson ever referenced "Objectiva" during his work at IBM, this

would not have informed IBM of what the Objectiva Architecture was, that it might be a trade secret, or that it was owned by Sisoian or Objectiva Innovations, a company that formally dissolved in 2000.

For the same reasons, Sisoian's breach of fiduciary duty claim fails. Sisoian attributes joint liability to IBM because it "knowingly induced Anderson to breach his fiduciary duty and/or participated in the breach." Dkt. #190 at 10. In order to hold a third party liable as a joint tortfeasor for breach of fiduciary duty, the plaintiff must prove "(1) the existence of a fiduciary relationship; (2) that the third party knew of the fiduciary relationship; and (3) that the third party was aware that it was participating in the breach of that fiduciary relationship." *Meadows v. Hartford Life Ins. Co*., 492 F.3d 634, 639 (5th Cir. 2007) (cite omitted). As noted, Sisoian has no objective evidence to support his claim of Anderson's fiduciary duty. What's more, he has no evidence that IBM would have known about it, let alone consciously participated in a breach.

## CONCLUSION AND PRAYER

For these reasons, the Court should grant summary judgment for IBM and dismiss all of Sisoian's claims with prejudice.

Dated: July 28, 2017                    Respectfully submitted,

R. Paul Yetter
State Bar No. 22154200
pyetter@yettercoleman.com
Collin J. Cox
State Bar No. 24031977
ccox@yettercoleman.com
YETTER COLEMAN LLP
909 Fannin, Suite 3600
Houston, Texas 77010
(713) 632-8000
(713) 632-8002 (Fax)

ATTORNEYS FOR DEFENDANT
INTERNATIONAL BUSINESS MACHINES
CORPORATION

## CERTIFICATE OF SERVICE

I certify that on this 28th day of July 2017, a true and correct copy of Defendant IBM's Motion for Summary Judgment was served electronically to all counsel of record.

*/s/ Collin J. Cox*
Collin J. Cox