```
 1                  UNITED STATES DISTRICT COURT
                     WESTERN DISTRICT OF TEXAS
 2                        AUSTIN DIVISION

 3   THOMAS C. SISOIAN          ) Docket No. A 14-CA-565 SS
                                )
 4   vs.                        ) Austin, Texas
                                )
 5   INTERNATIONAL BUSINESS     )
     MACHINES CORPORATION       ) July 12, 2017
 6

 7                     TRANSCRIPT OF STATUS CONFERENCE
                       BEFORE THE HONORABLE SAM SPARKS
 8

 9   APPEARANCES:

10   For the Plaintiff:        Mr. Gabriel R. Gervey
                               Ms. Nicole E. Glauser
11                             DiNovo, Price, Ellwanger & Hardy
                               7000 North MoPac Expressway,
12                             Suite 350
                               Austin, Texas 78731
13

14   For the Defendant:        Mr. Collin J. Cox
                               Mr. Christopher R. Johnson
15                             Mr. R. Paul Yetter
                               Yetter Coleman
16                             909 Fannin, Suite 3600
                               Houston, Texas 77010
17

18   Court Reporter:           Ms. Lily Iva Reznik, CRR, RMR
                               501 West 5th Street, Suite 4153
19                             Austin, Texas 78701
                               (512)391-8792
20

21

22

23

24

25   Proceedings reported by computerized stenography, transcript
     produced by computer.
```

10:35:34  1          THE COURT:  This is 14-CV-565, <u>Sisoian vs.</u>

10:35:40  2  <u>International Business Machines Corporation</u>.

10:35:42  3          I'll take the announcements.

10:35:48  4          MS. GLAUSER:  Good morning, your Honor.

10:35:50  5          Nicki Glauser and Gabriel Gervey on behalf of Sisoian.

10:35:54  6          THE COURT:  Okay.

10:35:55  7          MR. COX:  Good morning, your Honor.

10:35:56  8          Collin Cox, Paul Yetter, and Chris Johnson for IBM.

10:36:00  9          THE COURT:  All right.  Y'all have been going through a

10:36:04  10  lot of lawyers, I was noticing.  Usually the machines allow

10:36:13  11  lawyers to withdraw, and that's because this is a case, as I've

10:36:20  12  indicated to you before, needs to be settled.  So apparently

10:36:28  13  y'all haven't listened to me.  As I tell those four sons of mine,

10:36:33  14  and they're all 50 or more, it's important to listen to me.

10:36:41  15          The main thing is, if that October docket doesn't break

10:36:46  16  down, you're not going to trial, and it goes to the -- there's

10:36:53  17  two ways that I do it.  I've only had to do it four times in 26

10:36:58  18  years.  I can put a case on the bubble and you go month to month

10:37:05  19  to month until I can fit it in; or I give you a concrete setting

10:37:13  20  in 2019 where you get a real good judge.  Because I'm 77, I don't

10:37:22  21  know that I'll be -- want to do this in 2019.

10:37:28  22          Austin has the heaviest civil docket in the country and

10:37:32  23  two judges.  We're supposed to have six, we're supposed to have

10:37:38  24  six eight years ago, but the Congress just doesn't see that.  And

10:37:41  25  my young partner, Judge Yeakel's only 72.  So we're handling best

| 10:37:49 | 1 | we can.  We were handling it a lot better when the Congress gave |
|---|---|---|
| 10:37:55 | 2 | us money and we could bring in judges because we've got |
| 10:37:59 | 3 | courtrooms and we were being able to handle our business. |
| 10:38:05 | 4 | But as you can see right now, nothing is happening in |
| 10:38:10 | 5 | the Congress, including funds to the judiciary.  We can't even |
| 10:38:14 | 6 | hire anybody at this point in time.  I heard this morning, in all |
| 10:38:18 | 7 | probability, they're going to close the government down, and this |
| 10:38:22 | 8 | time, they're going to make the Democrats do it because they're |
| 10:38:27 | 9 | going to propose a bill that builds the wall and so, the |
| 10:38:33 | 10 | Democrats will look bad.  I don't know how either party can look |
| 10:38:38 | 11 | worse than they have, but I'm not political, so I didn't say. |
| 10:38:43 | 12 | So where are you on settlement? |
| 10:38:47 | 13 | MS. GLAUSER:  Your Honor, pursuant to the Court's |
| 10:38:50 | 14 | order, plaintiff has made a new settlement demand, IBM has made a |
| 10:38:56 | 15 | counteroffer, but the parties have not reached agreement and it |
| 10:39:02 | 16 | doesn't appear as if they're close to agreement. |
| 10:39:04 | 17 | THE COURT:  All right.  Well, let me help you.  I think |
| 10:39:10 | 18 | the plaintiff has a sorry case.  You've got limitations I'm going |
| 10:39:16 | 19 | to have to decide in trial.  You've got a long period of time. |
| 10:39:22 | 20 | And I have read all of these expert motions not to have them |
| 10:39:34 | 21 | testify.  I'm in the process of reading the plaintiff's.  On the |
| 10:39:45 | 22 | other hand, seems like I've had two cases like this in the last |
| 10:39:49 | 23 | 16 months where the damages are exactly how the plaintiffs are |
| 10:39:56 | 24 | doing it with the owner and a mathematician.  I have not let |
| 10:40:03 | 25 | either testify in either case, and the cases were settled while |

10:40:10  1  the jury was out.  But the damage issue is out.  And in both

10:40:16  2  cases, the damages were 12 to $20 million.

10:40:22  3          So you've got some problems.  You've also got problems

10:40:27  4  in if I try this case, you're going to have four days, and in

10:40:35  5  that four days, because of the volume of work we have -- I've got

10:40:41  6  11:00, I've got a 2:00, I've got a 4:00.  I'm sentencing 21

10:40:46  7  people on Friday.  Tomorrow is just like this.  When we have a

10:40:54  8  week off, we are loaded up with the motions.

10:40:59  9          But I learned a long time ago, on the motions to

10:41:04  10 exclude expert opinions, I do it at trial.  It's worked out fine

10:41:11  11 because it requires a real dedicated reason, if you want to bring

10:41:16  12 it up, you bring it up, I excuse the jury, I listen to the

10:41:19  13 testimony, I will make a determination if the witness will

10:41:22  14 testify or what he will or she will testify about.  You'll have

10:41:28  15 your record and the loser gets the time.

10:41:34  16         And I have found that it cuts the motions to exclude 80

10:41:39  17 percent because most motions to exclude just require good

10:41:47  18 cross-examination, and that's one of the ways I look at it.  How

10:41:52  19 would I cross that witness and what are the weaknesses of it?

10:41:57  20 But I'll be prepared and I will be dismissing all of these

10:42:05  21 motions without prejudice to re-filing during trial.

10:42:07  22         So you don't know what witness you're going to have.

10:42:10  23 It's another reason to think about settlement.  But the main

10:42:16  24 reason is, you know, time and I will do my best.  I think it's a

10:42:23  25 fun case to try, actually.  The money cases with the banks, the

10:42:29  1  money cases with the class-action cases with the SEC, they're

10:42:35  2  just pains in the rear, but this is a fun case to try.  So I

10:42:42  3  would like to try it if I had that opportunity.

10:42:44  4        I'd like to try it and give you all the time in the

10:42:46  5  world because I think it's going to be interesting.  But that's

10:42:50  6  what we're doing.  If we go to trial, you're still the fourth

10:42:57  7  case and Professional Liability Insurance Services, Incorporated

10:43:13  8  vs. United States Risk is the one I was just saying that has

10:43:20  9  those books this big, 16 of them.  My guess is the motions for

10:43:31  10 summary judgment will not be granted.  It's a dilly.

10:43:45  11       Then Trust Bank of New York Mellon, if y'all were here,

10:43:49  12 you already heard that case.  I don't think that's going to be a

10:43:52  13 big one.  Lawrence vs. Aetna, you just heard, hopefully they will

10:43:59  14 get some sanity.  And I have one class-action case -- actually, I

10:44:09  15 have two-class action cases, but one of them is Fair Labor

10:44:12  16 Standards Act, so I don't think it's going to take that much

10:44:16  17 time.  The other one might well take time.  I don't know how to

10:44:21  18 fit it in.  So that's where we are.

10:44:23  19       My guess is you ought to look -- you've got Mr.

10:44:30  20 Sisoian, I guess he's still working for IBM?

10:44:33  21       MR. COX:  He's not, your Honor.

10:44:35  22       THE COURT:  Okay.  Well, he lasted longer than I

10:44:38  23 figured.  And y'all know what's going on a lot better than I.

10:44:51  24 But I purposely have held up on limitations, I think that's a

10:44:56  25 real issue problem that I will determine probably at the motion

10:45:03    1    for judgment.

10:45:06    2            So, let's see here, we're going to start off -- I'm

10:45:21    3    going to try to start you off on ten hours a side.  Most of my

10:45:24    4    bigger cases are tried with ten hours.  On complicated patents

10:45:30    5    cases -- in 1991, I never tried a patent case.  I tried cases

10:45:36    6    from New York to Los Angeles, mostly on the clock, mostly in

10:45:41    7    federal court.  The patents threw me because the lawyers were

10:45:46    8    engineers and then, they took long.  The first one was three

10:45:56    9    weeks long, which was longer than any case I'd ever tried.

10:46:04   10            And every Friday, the jury would write me a letter,

10:46:07   11    every single juror:  We do not understand anything going on in

10:46:11   12    the case.  And I would read that letter to the jurors -- I mean,

10:46:15   13    to the lawyers and didn't seem to -- so by '92, I limited them to

10:46:21   14    eight claims.  And the complicated cases, we selected a jury on

10:46:28   15    Monday, they went Monday, Tuesday, Wednesday, Thursday, Monday,

10:46:31   16    Tuesday, Wednesday to the jury, and that's been the way it has

10:46:35   17    been since '82.

10:46:37   18            Tried a lot of patents cases.  The lawyers have helped

10:46:40   19    me because they know that's what's going to do.  And we've been

10:46:45   20    able to move our dockets because it's a parallel docket from this

10:46:50   21    one.  I have a special master that has to do the Markman hearing,

10:46:55   22    and then, I have to fit them in.  So it's a difficult thing.

10:46:58   23            So ten hours is selection of a jury on Monday and

10:47:02   24    you'll be getting the case to the jury Thursday, hopefully

10:47:09   25    morning, but Thursday afternoon for sure.  It has benefits.  You

10:47:17  1  get a better jury.  They come in here and I tell them they're

10:47:22  2  going to be here for five weeks, well, I've already advised them

10:47:25  3  of that by letter.  You get -- you know, you get a lot of

10:47:36  4  excuses.

10:47:36  5       And Austin has an incredible -- of course, it's 16

10:47:40  6  counties around here, but mostly Austin, San Marcos and

10:47:45  7  Georgetown area.  But I'll have eight or nine people that hold

10:47:51  8  patents in the jury pool, which kind of makes it easier for those

10:47:57  9  folks to -- if they can't strike them all, they do settle it

10:48:01  10 pretty quickly sometimes.

10:48:07  11      How about the jury of seven persons with four strikes,

10:48:12  12 with a stipulation which the rules say a verdict of five?

10:48:19  13      MS. GLAUSER:  I believe plaintiff will be able to

10:48:21  14 stipulate to that.

10:48:22  15      MR. COX:  Your Honor, sounds good to us.  We'd just

10:48:24  16 like a chance to check with IBM, but we'll do that promptly.

10:48:28  17      THE COURT:  Good.  Send me down there.  I haven't heard

10:48:31  18 anything from the magistrates.  This is a case I really can't

10:48:39  19 give my magistrates because it's too big, too voluminous for them

10:48:45  20 to prepare.  They have to go alternate weeks for criminals.  We

10:48:49  21 have a large criminal docket.  Come back Friday.  And so, they

10:48:56  22 can't handle the case that's going to run more than a week.

10:49:01  23      So what I can do is bring in a retired judge -- not

10:49:10  24 retired but senior.  Generally they're from Louisiana, can be

10:49:19  25 from Mississippi.  And this case has enough romance where they

| | | |
|---|---|---|
| 10:49:27 | 1 | might take it.  When they see the volume, they may not.  But |
| 10:49:33 | 2 | anyway. |
| 10:49:34 | 3 | So let's do that within a week, I want letters okaying |
| 10:49:39 | 4 | a stipulation for seven and five.  And as I say, I loved it seven |
| 10:49:46 | 5 | and five as a defense lawyer because when you get eight, you |
| 10:49:52 | 6 | still get four strikes.  When you get nine, 10, or 11, or 12, you |
| 10:49:57 | 7 | get less strikes.  Works out good.  It works out well. |
| 10:50:12 | 8 | Are y'all through with discovery? |
| 10:50:16 | 9 | MR. COX:  We're close, your Honor.  We have a few |
| 10:50:18 | 10 | depositions that we've agreed by -- to extend past the schedule a |
| 10:50:22 | 11 | bit, but we're really close. |
| 10:50:23 | 12 | THE COURT:  Yeah, well, those are your dates. |
| 10:50:26 | 13 | MR. COX:  Yes, sir. |
| 10:50:27 | 14 | THE COURT:  Only time I get involved is when y'all get |
| 10:50:30 | 15 | a fuss and John puts them in a room with a key over there, and |
| 10:50:39 | 16 | when they undo their fuss, they get to go home.  So y'all don't |
| 10:50:45 | 17 | need to fuss.  Okay. |
| 10:50:50 | 18 | Okay.  So I don't want to waste your time, so let's go |
| 10:50:54 | 19 | through these three motions that I've got pending.  I have |
| 10:51:03 | 20 | sped-read them, even though one of them just was filed yesterday. |
| 10:51:08 | 21 | Thanks, by the way.  So let's start with the Plaintiff Sisoian. |
| 10:51:23 | 22 | MS. GLAUSER:  Did your Honor have a preference on which |
| 10:51:26 | 23 | motion to address first? |
| 10:51:27 | 24 | THE COURT:  Well, the motion to exclude Sisoian from |
| 10:51:30 | 25 | testifying with regard to damages. |

10:51:44  1          MS. GLAUSER:  Your Honor's original order instructed

10:51:48  2   the parties to file a report if any witness was going to offer

10:51:53  3   opinion testimony.  And following that order --

10:51:57  4          THE COURT:  Well, I didn't say file it.  I said if you

10:52:02  5   have an expert, you've got to serve that report by a specific day

10:52:06  6   in the scheduling.  I don't want to see it until trial because it

10:52:14  7   indicates it's going to -- I mean, look at your files.

10:52:19  8          MS. GLAUSER:  No.  Apologies, your Honor.  It was

10:52:20  9   served.  And so, in accordance with that order, we served a

10:52:24 10   report.  It is not an expert report.  It was served to identify

10:52:29 11   that the plaintiff would be offering lay opinion testimony under

10:52:33 12   Rule 701.

10:52:35 13          And the three areas upon which Mr. Sisoian will be

10:52:39 14   offering that lay opinion testimony are within his personal

10:52:44 15   knowledge; they are inferences that are rationally based on that

10:52:48 16   personal knowledge; and they do not require specific or

10:52:52 17   specialized scientific or technical knowledge.

10:52:56 18          THE COURT:  So tell me what they are because it sounds

10:52:59 19   just like the people I've been excluding: because they're going

10:53:02 20   to testifying as to the value of their company and the loss.

10:53:07 21          MS. GLAUSER:  There are three areas, your Honor, one of

10:53:09 22   which is, in fact, Mr. Sisoian's opinion regarding the value of

10:53:13 23   his company.  But under the advisory committee rule to Rule 701,

10:53:19 24   it specifically adopts the majority rule that allows an owner or

10:53:22 25   a founder of a company to offer, based on his or her personal

10:53:28  1   knowledge, the valuation that they placed on the company.

10:53:32  2        Now, of course, that will be subject to

10:53:34  3   cross-examination, and in our opinion, it will be supported by

10:53:38  4   expert opinion regarding damages valuation.  But here, we are not

10:53:44  5   offering Mr. Sisoian's testimony as expert opinion as a valuation

10:53:50  6   regarding Objectiva.  We are, instead, offering it as his lay

10:53:55  7   opinion, based on his 35 years working in the telecommunications

10:53:59  8   industry and as a technology special -- as a sales tech --

10:54:04  9        THE COURT:  I understand from the motion that he has no

10:54:07 10   experience whatsoever in the, what is it, not the trade secret

10:54:17 11   but the makeup of the formula, the stuff that runs his valuable

10:54:35 12   company that never made a dime and never got on into business.

10:54:40 13        MS. GLAUSER:  It's true, your Honor, that he is not the

10:54:42 14   person who wrote the code for it, but there are oftentimes

10:54:47 15   businesses where the founder or the owner of the business is

10:54:50 16   capable of hiring their engineering team that does that work, is

10:54:56 17   personally knowledgeable about the amount of time, effort and

10:54:59 18   money that is spent in developing the product that is source

10:55:04 19   code, or includes the source code, who is responsible for

10:55:08 20   developing the business plan and marketing plan and doing the

10:55:11 21   industry research that would indicate to that businessowner

10:55:17 22   whether the pursuit of this product or the development of the

10:55:19 23   software or source code is a worthy investment for them.

10:55:24 24        And that is the perspective from which we would be

10:55:27 25   offering Mr. Sisoian's lay opinion on the value of this product:

10:55:31  1  Why he pursued it and how he pursued it.

10:55:34  2         THE COURT:  Now, it's my understanding -- tell me if

10:55:38  3  I'm wrong -- that that company never was commercially viable.

10:55:45  4         MS. GLAUSER:  It -- no.  You're correct, your Honor.

10:55:49  5  Eventually, the company was dissolved, but in that time, he had

10:55:54  6  negotiations with other companies that did express desire and

10:55:57  7  want and benefits regarding the product that it was -- that

10:56:03  8  Objectiva was developing; and, in addition to that, it obviously

10:56:07  9  has some value considering that Francis Anderson took it with him

10:56:11  10  to IBM, and there is almost no dispute in this case that he used

10:56:16  11  it at IBM, and IBM knows that it was used.

10:56:21  12         THE COURT:  Well, now you're crossing the bridge a

10:56:23  13  little bit.

10:56:24  14         So tell me, again -- and I'm very familiar with the

10:56:30  15  writings of those folks that know so much.  But I'm also pretty

10:56:38  16  familiar with expert testimony.  So what is he going to testify

10:56:44  17  with regard to damage?  What is -- for example, his value of this

10:56:52  18  company that never operated and that he didn't even take it -- he

10:56:57  19  asked somebody else to take it.

10:56:59  20         MS. GLAUSER:  He is not going to offer a dollar figure.

10:57:03  21         THE COURT:  Well, what is he going to offer?  That's

10:57:05  22  what the main thing is before -- so I can kind of decide what

10:57:08  23  you're going to do so that you can try the case in a week.

10:57:12  24         MS. GLAUSER:  Mr. Sisoian will be offering testimony

10:57:14  25  that shows that this source code software and know-how would have

| | | |
|---|---|---|
| 10:57:20 | 1 | been valuable within the market, that it would have solved a |
| 10:57:24 | 2 | long-felt need within particularly the telecommunications |
| 10:57:27 | 3 | industry. |
| 10:57:28 | 4 | THE COURT:  And would be subject to the |
| 10:57:31 | 5 | cross-examination that it never was, it never did and -- |
| 10:57:34 | 6 | MS. GLAUSER:  Absolutely. |
| 10:57:35 | 7 | THE COURT:  Okay.  Is he going to put a value on it? |
| 10:57:39 | 8 | MS. GLAUSER:  He is not. |
| 10:57:39 | 9 | THE COURT:  Okay.  All right.  That helps me. |
| 10:57:40 | 10 | MS. GLAUSER:  He will testify to his personal knowledge |
| 10:57:42 | 11 | regarding, for instance, negotiations that he had with Lucent and |
| 10:57:45 | 12 | if dollar figures were exchanged in those negotiations, even if |
| 10:57:49 | 13 | they ultimately failed, what offers were made. |
| 10:57:52 | 14 | THE COURT:  He may or may not.  Okay.  Go ahead.  What |
| 10:57:54 | 15 | else for Sisoian? |
| 10:57:56 | 16 | MS. GLAUSER:  The other opinion -- lay opinion that we |
| 10:57:58 | 17 | intend for Mr. Sisoian to offer would be that it would be |
| 10:58:01 | 18 | difficult to duplicate or recreate the Objectiva architecture, |
| 10:58:06 | 19 | software and source code, and that would be based on his personal |
| 10:58:09 | 20 | knowledge of the amount of time that it took his developers -- |
| 10:58:14 | 21 | THE COURT:  Even though he didn't create it and he's |
| 10:58:15 | 22 | not qualified in the code? |
| 10:58:18 | 23 | MS. GLAUSER:  He oversaw his code developers in writing |
| 10:58:21 | 24 | it. |
| 10:58:21 | 25 | THE COURT:  Well, sure.  I oversee patents cases.  I |

10:58:29   1   can't any more tell you what the source code was than the man on

10:58:33   2   the moon.

10:58:33   3          MS. GLAUSER:  No.  But you can and could identify how

10:58:36   4   long it takes to -- it took his team to create that product, how

10:58:43   5   much money it took, how difficult the process was, and thus, his

10:58:46   6   opinion that the ability to duplicate this would have been a

10:58:51   7   difficult, time-consuming, and expensive venture.

10:58:55   8          THE COURT:  For others to do it.

10:58:57   9          MS. GLAUSER:  As it was for him.

10:58:58   10          THE COURT:  Well, okay.

10:59:01   11          MS. GLAUSER:  The third opinion, your Honor, is Mr.

10:59:03   12   Sisoian's knowledge that in the industry, this particular

10:59:07   13   architecture was not generally known, and that would be based on

10:59:11   14   his familiarity within the industry of what outstanding need

10:59:16   15   there was for this product.  If the particular architecture that

10:59:21   16   allowed you to develop this telecommunications business solution

10:59:24   17   package had already existed, then Mr. Sisoian would not have

10:59:30   18   undertook the founding of Objectiva, and the difficult and

10:59:35   19   lengthy process of developing the Objectiva architecture and

10:59:39   20   software.

10:59:42   21          Those are the three opinions that we intend for Mr.

10:59:43   22   Sisoian to offer, not based on scientific or technical knowledge.

10:59:48   23   Simply based on his personal knowledge, what he experienced and

10:59:52   24   what he knows from his time in the industry.

10:59:56   25          THE COURT:  So he doesn't know the code, he's not

| | | |
|---|---|---|
| 10:59:59 | 1 | familiar with it, but he's going to testify that it would have |
| 11:00:04 | 2 | helped other -- I mean, I'm not catching on to. |
| 11:00:12 | 3 | MS. GLAUSER:  Although he didn't write the code, I |
| 11:00:14 | 4 | think he is familiar with what the software was capable of doing, |
| 11:00:17 | 5 | how the code that was written would have been used, and what |
| 11:00:21 | 6 | benefit it would have offered. |
| 11:00:23 | 7 | THE COURT:  Okay. |
| 11:00:24 | 8 | MS. GLAUSER:  He was absolutely the salesperson that, |
| 11:00:26 | 9 | for instance, went to Lucent and discussed with them the |
| 11:00:28 | 10 | potential of them buying the product.  As a result, he would have |
| 11:00:32 | 11 | known and does know what the product was capable of doing, even |
| 11:00:35 | 12 | if he wasn't the person who technically wrote the source code |
| 11:00:39 | 13 | that allows it to function in that way. |
| 11:00:41 | 14 | THE COURT:  Well, okay. |
| 11:00:44 | 15 | MR. COX:  Thank you, your Honor. |
| 11:00:46 | 16 | May it please the Court, we won't sort of repeat |
| 11:00:50 | 17 | arguments, hopefully too much, made in the brief on this, on |
| 11:00:54 | 18 | these three topics.  I think it is helpful to hear for the first |
| 11:00:56 | 19 | time that Mr. Sisoian wouldn't be offering a dollar figure.  That |
| 11:01:00 | 20 | was -- that's the first we've heard of that. |
| 11:01:01 | 21 | But the idea that he would offer testimony as to value |
| 11:01:04 | 22 | at all for a dissolved company that made no sales -- |
| 11:01:09 | 23 | THE COURT:  Well, you know, if I were you, I would love |
| 11:01:13 | 24 | for him to do that. |
| 11:01:14 | 25 | MR. COX:  Understand, your Honor.  And we appreciate |

| | | |
|---|---|---|
| 11:01:17 | 1 | he's going to be a fact witness, but when he goes into questions |
| 11:01:20 | 2 | of value -- |
| 11:01:21 | 3 | THE COURT:  What is your position with regard to he is |
| 11:01:23 | 4 | the spokesman for the company, he tries to negotiate commercial |
| 11:01:29 | 5 | work for it, so he knows it well enough to know what the |
| 11:01:31 | 6 | architecture can do? |
| 11:01:32 | 7 | MR. COX:  Your Honor, that's just -- that's not the |
| 11:01:35 | 8 | discovery record we have here at all.  Mr. Sisoian was adamant in |
| 11:01:38 | 9 | his deposition that he knew nothing about the code, wasn't the |
| 11:01:41 | 10 | coder, put together the team. |
| 11:01:43 | 11 | THE COURT:  She says he doesn't need to know that to |
| 11:01:45 | 12 | know the value. |
| 11:01:46 | 13 | MR. COX:  But he does to have sort of the 701 knowledge |
| 11:01:48 | 14 | that they'd like to offer him for.  If they want to put him on |
| 11:01:51 | 15 | the stand and say, I put together a team of people who really |
| 11:01:54 | 16 | know about that and then, put those people up, one a time, that's |
| 11:01:57 | 17 | one thing.  But to sort of put it up as a spokesperson for value, |
| 11:02:00 | 18 | which is what they want to do, and say this was an important |
| 11:02:03 | 19 | product, even though nobody bought it and we had one negotiation |
| 11:02:06 | 20 | that fizzled quickly, the idea that he could sort of gather up |
| 11:02:09 | 21 | the knowledge of a team from ten years ago and speak on behalf of |
| 11:02:13 | 22 | all of these folks who actually know how to code isn't what 701 |
| 11:02:17 | 23 | contemplates.  That's not at all the situation. |
| 11:02:20 | 24 | THE COURT:  Okay. |
| 11:02:20 | 25 | MR. COX:  And -- |

| | | |
|---|---|---|
| 11:02:21 | 1 | THE COURT:  So it sounds like I'll have to listen to |
| 11:02:23 | 2 | the testimony, one way or the other.  But right now, it looks |
| 11:02:28 | 3 | like it would be crossable. |
| 11:02:30 | 4 | MR. COX:  Your Honor, except for the idea of any |
| 11:02:32 | 5 | marketing -- |
| 11:02:32 | 6 | THE COURT:  I get a chance, too, every once in a while, |
| 11:02:35 | 7 | usually when I raise my hand. |
| 11:02:39 | 8 | That everything that's been said is -- can be handled |
| 11:02:44 | 9 | on cross-examination and anything on value can be objected to. |
| 11:02:52 | 10 | Okay. |
| 11:02:54 | 11 | MR. COX:  Yeah.  That's right. |
| 11:02:56 | 12 | THE COURT:  Okay.  Well, let me hear from the defendant |
| 11:03:00 | 13 | now on -- is it "Jarose"?  "Jarose"? |
| 11:03:07 | 14 | MR. COX:  Your Honor, I think it's Jarosz. |
| 11:03:09 | 15 | MS. GLAUSER:  It rhymes with Paris, so it's Jarosz. |
| 11:03:13 | 16 | THE COURT:  Jarosz. |
| 11:03:15 | 17 | MR. COX:  Jarosz, okay.  Thank you, your Honor. |
| 11:03:19 | 18 | Again, not to repeat what we've said in the papers, but |
| 11:03:23 | 19 | Mr. Jarosz relies heavily on this 80-20 split that somehow, |
| 11:03:29 | 20 | Francis Anderson is responsible for 80 percent of all the value |
| 11:03:34 | 21 | here.  He had no independent work to sort of verify that 80 |
| 11:03:39 | 22 | percent, and that's sort of our first criticism of that.  The |
| 11:03:42 | 23 | idea that he can extrapolate from another expert, the percentage |
| 11:03:46 | 24 | of work attributable to a single employee is not what the rules |
| 11:03:52 | 25 | contemplate in terms of expert testimony. |

| 11:03:54 | 1 | THE COURT:  Is Anderson going to testify? |
| 11:03:57 | 2 | MR. COX:  He was deposed.  He will either testify live |
| 11:04:00 | 3 | or by deposition. |
| 11:04:01 | 4 | THE COURT:  And then, this Almeroth? |
| 11:04:07 | 5 | MR. COX:  Yes, your Honor -- |
| 11:04:08 | 6 | THE COURT:  Takes the 80 percent and runs it across the |
| 11:04:13 | 7 | profits. |
| 11:04:15 | 8 | MR. COX:  He does and Jarosz does that, as well.  And I |
| 11:04:18 | 9 | think that's -- and he gets to numbers that are bigger than the |
| 11:04:21 | 10 | actual revenue, even if you assumed any of these products have |
| 11:04:24 | 11 | the source code, which they don't.  Again, it's not a case where |
| 11:04:29 | 12 | they have shown or could show that any IBM product has the source |
| 11:04:34 | 13 | code at all.  It doesn't. |
| 11:04:35 | 14 | THE COURT:  Okay.  Let's concentrate on Anderson.  Tell |
| 11:04:39 | 15 | me who Anderson is and what you anticipate from his deposition. |
| 11:04:44 | 16 | MR. COX:  Sure. |
| 11:04:44 | 17 | Anderson was the person who worked closely with Tom |
| 11:04:47 | 18 | Sisoian for some time.  Sisoian then brought him with him to IBM. |
| 11:04:51 | 19 | They sort of separated then, but they had a sort of a long -- |
| 11:04:55 | 20 | THE COURT:  He was the custodian. |
| 11:04:56 | 21 | MR. COX:  He was not the custodian.  He was the -- |
| 11:04:58 | 22 | THE COURT:  But did he give it to somebody else? |
| 11:05:00 | 23 | MR. COX:  To James Hartman.  That's right, your Honor. |
| 11:05:02 | 24 | So Anderson is the principal author of the source code |
| 11:05:06 | 25 | of Objectiva.  He testified about a variety of things that we'll |

11:05:11  1  put forward in our summary judgment papers including that he

11:05:14  2  widely distributed the source code.  He went to conferences as

11:05:19  3  one in 1998, in Illinois, where he transmitted the source code

11:05:22  4  beforehand, the conference that Mr. Sisoian knew about and allege

11:05:26  5  -- and told us at his deposition he approved.  Anderson said at

11:05:30  6  his deposition, he sent that code to the organizer, no

11:05:33  7  restrictions of confidentiality, anyone could look at it, and

11:05:36  8  people did look at it outside of Objectiva.

11:05:38  9        Anderson said he is the person who, again, wrote most

11:05:41  10  of the code, took it with him when he left.

11:05:44  11        THE COURT:  Well, if you publicly display in the patent

11:05:50  12  world, it's free gold.  What is the theory here?

11:05:56  13        MR. COX:  That's right, your Honor.

11:05:58  14        And this is one of those things that with the benefit

11:06:00  15  of extra times we had during this last year, we asked about that

11:06:05  16  1998 conference, in particular, and said, let's find everyone

11:06:08  17  from 20 years ago who attended and talked to him, and one of the

11:06:11  18  people who organized it had the source code from 20 years ago in

11:06:15  19  his files, way back when.  And we asked him:  Do you have a

11:06:18  20  confidentiality agreement?  Any restrictions?  No.  He submitted

11:06:22  21  an affidavit on that.  He was deposed on that by Sisoian's

11:06:25  22  counsel, and plain as day, he's had it for 20 years, has it

11:06:25  23  today.

11:06:29  24        So that's one of the things we've done with this extra

11:06:31  25  time is sort of find other ways why -- we believe and that we'll

11:06:35  1  be able to show that Mr. Sisoian can't satisfy the Bass factors,

11:06:40  2  including that he has to try to keep it secret.  He has to take

11:06:44  3  reasonable precautions of keeping this from the public.  And

11:06:47  4  you're absolutely right, Judge, that when it's publicly displaced

11:06:51  5  and, frankly, when it's not protected, whether it goes on the

11:06:54  6  internet or whatever, if someone doesn't do a reasonable job in

11:06:57  7  keeping it secret, that's the end of the analysis.  It can't be a

11:07:01  8  trade secret.

11:07:01  9          And there's no dispute that Mr. Anderson sent to this

11:07:06  10  conference organizer the then-current version of the source code

11:07:11  11  as of May 1998, and we think that ends the analysis as to whether

11:07:15  12  there has been disclosure or not.

11:07:17  13          So Francis Anderson lives in England, he's not subject

11:07:21  14  to the subpoena power.  We took his deposition with an eye to

11:07:24  15  trial, and we'll cut that testimony down.  He may end up being

11:07:28  16  live for us.  Obviously we'll take the Court's direction in terms

11:07:31  17  of hours we have to spend.  But he is a relevant witness, rather

11:07:36  18  live or by deposition.

11:07:37  19          And we think he's going to be very helpful to the IBM

11:07:40  20  position, even though he was dismissed by IBM.  He said, I

11:07:42  21  considered myself -- I certainly didn't consider Tom Sisoian the

11:07:46  22  author of the source code, because I wrote it, and if anyone owns

11:07:50  23  it, it's me.  That's a whole other sort of story to tell.  But

11:07:55  24  this public disclosure point and sort of whether that's --

11:07:58  25  whether that affects the Bass factor of trade secrecy, I think,

| | | |
|---|---|---|
| 11:08:02 | 1 | is probably the most relevant thing that Francis Anderson has to |
| 11:08:07 | 2 | say. |
| 11:08:07 | 3 | THE COURT:  Well, I think that's helpful for my |
| 11:08:10 | 4 | preparation, but let's get back to Jarosz. |
| 11:08:13 | 5 | MR. COX:  Right.  So, again, this 80 percent number is |
| 11:08:16 | 6 | very problematic.  And, again, the other big argument with Jarosz |
| 11:08:20 | 7 | is that the numbers he has are actually greater in terms of what |
| 11:08:25 | 8 | he claims to be Sisoian's loss, are greater than the actually |
| 11:08:29 | 9 | revenue numbers from IBM sales of products that don't include the |
| 11:08:34 | 10 | source code of this product. |
| 11:08:35 | 11 | So this is sort of a "how is this going to help the |
| 11:08:38 | 12 | jury."  Obviously these are cross points.  We can make a lot of |
| 11:08:40 | 13 | this point in terms of the actual numbers IBM had.  But whether |
| 11:08:44 | 14 | he should even be allowed to say those numbers to the jury speaks |
| 11:08:49 | 15 | to the Court's gatekeeping role, whether he's going to offer |
| 11:08:52 | 16 | testimony that would be even helpful, assuming that's right, |
| 11:08:55 | 17 | because it's not based in science.  It's not based in the |
| 11:08:58 | 18 | empirical evidence that IBM has provided to Mr. Sisoian of actual |
| 11:09:03 | 19 | sales. |
| 11:09:03 | 20 | Again, we dispute liability because there's no evidence |
| 11:09:05 | 21 | of source code in any of these products.  But even if he's right |
| 11:09:09 | 22 | that somehow these products are implicated, the numbers he has |
| 11:09:13 | 23 | just don't match up. |
| 11:09:16 | 24 | MS. GLAUSER:  Your Honor, Mr. Gervey, with permission, |
| 11:09:19 | 25 | is going to respond. |

| | | |
|---|---|---|
| 11:09:20 | 1 | THE COURT:  Sure. |
| 11:09:32 | 2 | MR. GERVEY:  Thank you.  Good morning, your Honor. |
| 11:09:33 | 3 | THE COURT:  Good morning, we've still got 50 minutes. |
| 11:09:37 | 4 | MR. GERVEY:  If I could, your Honor, quickly, this |
| 11:09:40 | 5 | isn't germane, I think, to our discussion with Mr. Jarosz, but we |
| 11:09:43 | 6 | can't let IBM's characterization of what happened at the 1998 |
| 11:09:46 | 7 | conference go unchallenged.  So if I could briefly comment on our |
| 11:09:50 | 8 | position about what happened with Mr. Anderson and the |
| 11:09:53 | 9 | conference. |
| 11:09:53 | 10 | THE COURT:  Please. |
| 11:09:56 | 11 | MR. GERVEY:  So in advance of the conference, Mr. |
| 11:09:59 | 12 | Anderson did send some source code to a conference organizer who |
| 11:10:04 | 13 | has come forward with it.  That person is also IBM's paid |
| 11:10:08 | 14 | consulting witness in this case who is paid for the declaration |
| 11:10:11 | 15 | that they signed, stating that they have the source code. |
| 11:10:14 | 16 | THE COURT:  That's just cross-examination. |
| 11:10:17 | 17 | MR. GERVEY:  And critically, your Honor, the source |
| 11:10:19 | 18 | code that was sent to him does not disclose all of the trade |
| 11:10:23 | 19 | secrets.  It's not the complete source code that's at issue in |
| 11:10:25 | 20 | this case.  There is no indication that that source code was sent |
| 11:10:31 | 21 | to him for any purpose than to put on a computer so that Mr. |
| 11:10:34 | 22 | Anderson could operate the software and display it at the |
| 11:10:37 | 23 | conference and talk about it. |
| 11:10:39 | 24 | There's no evidence that person further distributed the |
| 11:10:42 | 25 | source code to anyone. |

11:10:43  1      THE COURT:  What difference does it make?  You say that

11:10:47  2  you wouldn't have an instruction that any part of the source code

11:10:51  3  that was publicly displayed, for any reason, is in the public

11:10:56  4  domain and cannot be the issue of damages?

11:11:01  5      MR. GERVEY:  So there is no indication that anything

11:11:04  6  that we have claimed that's trade secret was, in fact, displayed

11:11:07  7  at the conference.

11:11:09  8      So Mr. Anderson did discuss the software at the

11:11:12  9  conference.  Mr. Anderson pub -- there is a paper that was

11:11:14  10  published following the conference that discusses the software;

11:11:18  11  however, we are not claiming the information in that paper as

11:11:22  12  trade secret.  There is other information, there are other

11:11:26  13  sections of the code, the way that those sections that remain

11:11:30  14  secret interact with what is public.

11:11:32  15      THE COURT:  So part of -- you know, you weren't here,

11:11:36  16  but I was trying to get, at one point in time, for them to

11:11:40  17  explain to me what the trade secret was because they said they

11:11:43  18  didn't know, said they did.  You've said it was 500 pages and

11:11:49  19  they said whatever.

11:11:52  20      So now, on something that I have no definition in, you

11:11:55  21  say part of it if it's disclosed is meaningless and part of it is

11:12:01  22  not.  Is that what you're telling me?

11:12:04  23      MR. GERVEY:  Your Honor, I think our position is that

11:12:05  24  the case law supports the idea that the combination of --

11:12:08  25      THE COURT:  Don't worry about the case law --

| | | |
|---|---|---|
| 11:12:10 | 1 | MR. GERVEY:  -- public -- sure. |
| 11:12:12 | 2 | THE COURT:  -- that's my job. |
| 11:12:13 | 3 | MR. GERVEY:  Yes. |
| 11:12:14 | 4 | So, your Honor, we have three -- identified two |
| 11:12:19 | 5 | discrete collections of source code that we are claiming as trade |
| 11:12:23 | 6 | secret.  And it is our position that the trade secrets within |
| 11:12:27 | 7 | that source code, not all of them -- we are not claiming anything |
| 11:12:31 | 8 | as trade secret that was discussed at the conference.  And -- |
| 11:12:35 | 9 | THE COURT:  And how do you extrapolate it?  I mean, how |
| 11:12:38 | 10 | do you -- you have what went to the conference? |
| 11:12:42 | 11 | MR. GERVEY:  We do have what went -- we have what was |
| 11:12:45 | 12 | at the conference, but there's no evidence of what was actually |
| 11:12:47 | 13 | shown at the conference.  The only evidence is that this person |
| 11:12:50 | 14 | received the code as a conduit to put on the computer so that |
| 11:12:54 | 15 | Anderson could run the software and discuss the software at the |
| 11:12:57 | 16 | conference.  There is no evidence -- no witness, not Anderson, |
| 11:13:01 | 17 | not the person who found the code, no one could identify a |
| 11:13:05 | 18 | single, discrete piece of software or a source code that was |
| 11:13:08 | 19 | discussed at the conference. |
| 11:13:12 | 20 | And there is testimony -- there will be expert |
| 11:13:15 | 21 | testimony that the size of the source code is such that it was |
| 11:13:18 | 22 | not permissible or possible to discuss all of it in one session, |
| 11:13:21 | 23 | on one day at a conference. |
| 11:13:23 | 24 | THE COURT:  Well, whether it was discussed or not, I'm |
| 11:13:26 | 25 | trying to get in my mind, did all of the source code go and then, |

11:13:35 1  only part of it, you're saying, got on discussion?  Or just part

11:13:41 2  of it could have been publicly and the other part not?

11:13:46 3         MR. GERVEY:  Correct, your Honor.  There may be some

11:13:48 4  that was discussed at the conference, but no one can identify

11:13:51 5  what that is.  But to counter IBM's point, the code itself was

11:13:54 6  not distributed at the conference.  There's no evidence that

11:13:57 7  anyone received it or took copies home.  It was contained on the

11:14:04 8  computer on which it was displayed.

11:14:06 9         THE COURT:  Well, I just had a case where you had

11:14:15 10 confidentiality agreements on surgical patents, and one of the

11:14:24 11 things that wasn't covered in the confidentiality was the

11:14:31 12 surgical procedure itself.  So they showed the surgical procedure

11:14:40 13 and it wasn't protected.  So I held it was publicly in the public

11:14:48 14 realm because other people saw the surgical procedure, doctors

11:14:52 15 and pharmaceutical people.  And you can check that in the Fifth

11:15:00 16 Circuit, it got upheld.  It got in the public domain.

11:15:04 17        And you're saying this went -- could have gotten in the

11:15:07 18 public domain, but your evidence is that it didn't.

11:15:11 19        MR. GERVEY:  I think there's no evidence that anything

11:15:14 20 was in the public domain beyond the scope of the paper.  We have

11:15:21 21 addressed that by not claiming anything as trade secret that is

11:15:25 22 in the paper that was published subsequent to the conference,

11:15:29 23 your Honor.

11:15:29 24        THE COURT:  Okay.  All right.  How about your economic

11:15:34 25 person, Jarosz?

11:15:36  1          MR. GERVEY:  Yes.  Thank you, your Honor, your Honor.

11:15:41  2   I'd like to discretely address the two points brought by IBM's

11:15:46  3   counsel.

11:15:46  4          First, looking at Mr. Jarosz's apportionment opinion of

11:15:49  5   at least 80 percent, this opinion is based on sound economic

11:15:52  6   analysis.

11:15:55  7          THE COURT:  Tell me what it is and I'll make a decision

11:15:58  8   if it's sound.

11:16:00  9          MR. GERVEY:  Very good, your Honor.

11:16:01 10          So he is a opining that appropriate apportionment here

11:16:04 11   is at least 80 percent, and he is doing this based on input from

11:16:08 12   our technical expert, Professor Almeroth, which he considers, in

11:16:12 13   light of the record.  And the things that he evaluated include

11:16:15 14   the benefits -- whether the trade secrets provide the benefits

11:16:19 15   that drive the sales of the IBM products at issue, whether -- he

11:16:24 16   elaborates that he discussed the benefits in this product with

11:16:27 17   Mr. Francis Anderson.

11:16:30 18          He looks at IBM marketing documents, and he

11:16:33 19   specifically considers that the WSDLs and XSDs, which are

11:16:36 20   components of the IBM product, are the most innovative or

11:16:39 21   creative of the trade secrets.  He considers that the messaging

11:16:42 22   model, which is the most important feature of the software -- the

11:16:45 23   IBM product, was created with the trade secrets.  He considers

11:16:48 24   that five out of seven key features were fully or substantially

11:16:52 25   enabled by the trade secrets.  These are the shared information

11:16:54  1   data model and telecom service models within the IBM product.  He

11:17:00  2   excludes from consideration the e-TOM standard as implemented by

11:17:05  3   Mr. Chandrasekaran, who is another IBM employee.

11:17:08  4          IBM never deposed Mr. Jarosz on these opinions.  They

11:17:10  5   were issued after his deposition.  These sections of his reports

11:17:14  6   are not cited in IBM's motion.  Jarosz considers all of this

11:17:20  7   evidence, and he considers the technical opinion, in light of

11:17:23  8   this economic evidence.  And additional evidence, including the

11:17:27  9   IBM's product team made de minimis contributions to the product

11:17:30  10  at issue --

11:17:30  11         THE COURT:  Whoa, whoa, slow down a little bit.

11:17:33  12         MR. GERVEY:  Yes, your Honor.

11:17:34  13         And that there was no alternative that was capable of

11:17:37  14  providing the benefits of the trade secret.  So he looked at all

11:17:39  15  -- he looked at the full record and considered the technical

11:17:42  16  valuation, in light of that, and then, issued his apportionment

11:17:46  17  analysis.  So it is an economic opinion --

11:17:47  18         THE COURT:  Eighty percent of all profit.  So there was

11:17:51  19  only 20 percent equity in the work in all of this stuff?  You're

11:17:56  20  going to have a jury believe that?

11:17:58  21         MR. GERVEY:  That 80 percent of the profit is he is

11:18:03  22  submit -- has submitted, I believe, economically justified

11:18:06  23  opinion that 80 percent of the profit is attributable to the

11:18:09  24  trade secrets.

11:18:12  25         THE COURT:  The part you selected.  Come on, you guys

| | | |
|---|---|---|
| 11:18:17 | 1 | need to settle this case.  Go ahead. |
| 11:18:20 | 2 | MR. GERVEY:  Very good, your Honor. |
| 11:18:21 | 3 | As to the application of that apportionment to the |
| 11:18:24 | 4 | other revenue of timing sales, Mr. Jarosz's economic model, the |
| 11:18:30 | 5 | intuition works like this, if I can have a moment to explain it. |
| 11:18:35 | 6 | The intuition is that if the trade secrets were to result in 80 |
| 11:18:38 | 7 | percent of the sales looking at the units sold, those sales would |
| 11:18:42 | 8 | still drive sales of other -- the other IBM timing products such |
| 11:18:46 | 9 | that it's appropriate to include the revenue from those, and in |
| 11:18:49 | 10 | that way, the 80 percent is passed through to the other products. |
| 11:18:53 | 11 | That is the economic -- that fits within the economic model that |
| 11:18:55 | 12 | he's described. |
| 11:18:56 | 13 | THE COURT:  Yeah, well, I'll hear him.  But let's -- 80 |
| 11:19:04 | 14 | percent and then, figure that it's going to be a catalyst to all |
| 11:19:08 | 15 | of the other sales that he doesn't have any information about is |
| 11:19:11 | 16 | a little queasy. |
| 11:19:15 | 17 | MR. GERVEY:  Your Honor, if I -- |
| 11:19:16 | 18 | THE COURT:  I'm not making a decision right now. |
| 11:19:19 | 19 | MR. GERVEY:  Thank you, your Honor. |
| 11:19:19 | 20 | THE COURT:  Sounds to me like that we're going to hear |
| 11:19:26 | 21 | Mr. Jarosz's testimony before he gets on the stand.  But that's |
| 11:19:32 | 22 | all right. |
| 11:19:33 | 23 | Okay.  So as long as you're up there, tell me -- I've |
| 11:19:35 | 24 | got three of them.  Jarosz's, Sisoian.  Who is the fellow that I |
| 11:19:46 | 25 | just got yesterday? |

11:19:48  1          MR. COX:  Easttom.

11:19:50  2          MR. GERVEY:  Easttom.

11:19:53  3          MR. COX:  Judge, it's Charles Easttom.

11:19:55  4          MR. GERVEY:  Charles Easttom.

11:19:57  5          Your Honor, in terms of responding to Easttom, we've

11:20:03  6  actually asked IBM for an extension to respond to that motion.

11:20:06  7  We've just received it on Monday evening.  And we're in the midst

11:20:09  8  of responding to 20 summary judgment motions in another matter

11:20:12  9  that is ongoing, and we have attorneys traveling of the office in

11:20:17  10  deposition.

11:20:18  11          THE COURT:  You know, that's fine.  I'm busy, too.  But

11:20:21  12  you're here and I'm here, and I'm going to not see you again

11:20:26  13  until jury selection.

11:20:27  14          So why don't you tell me, if you're going to put him on

11:20:29  15  the stand, you ought to have a pretty good idea what he's going

11:20:36  16  to say.

11:20:36  17          MR. GERVEY:  Fair enough, your Honor.

11:20:37  18          Your Honor Mr. Easttom is going to testify to his

11:20:40  19  in-depth analysis of the source code of -- plaintiff's source

11:20:44  20  code, his comparison of plaintiff's source code to the IBM -- to

11:20:51  21  what Mr. Anderson used at IBM, and as well as critically, he's

11:20:56  22  going to offer a comparison of the structure of plaintiff's

11:20:59  23  source code to the structure of the IBM product.  And Mr. Easttom

11:21:02  24  has identified several sections of the IBM product itself, aware

11:21:07  25  of the structures -- they're written in different languages.  But

11:21:10  1   the structure of the source code as he has set forth has mirrored

11:21:15  2   the structure of the Objectiva source code.

11:21:18  3        THE COURT:  Well, now, they say he didn't compare them

11:21:20  4   with the source code that you're suing over.

11:21:26  5        MR. GERVEY:  It is in different languages.  But we have

11:21:28  6   and in Mr. Easttom's opinion is that there are identifiable

11:21:31  7   structures in the IBM source code that are comparable to the

11:21:36  8   structures in our source code.  And so, they have -- IBM has

11:21:41  9   repeatedly stated that this is not a direct copy case.  That's

11:21:46  10  true in the sense that the languages aren't the same, but we have

11:21:48  11  evidence that the structures from our code are present in the IBM

11:21:52  12  product, and some of Mr. Easttom's testimony pertains to that.

11:21:58  13       THE COURT:  Okay.  I'm not sure I understand.  It's

11:22:01  14  either he did or he didn't compare them, or he did compare them

11:22:06  15  but it was his opinion understanding both source codes that

11:22:12  16  they're similar, or the same, or copied, but he didn't read the

11:22:22  17  source code of the.

11:22:26  18       MR. GERVEY:  Your Honor, he reviewed the source code of

11:22:27  19  the IBM product and he reviewed the source code of plaintiff's

11:22:32  20  product, and in one of his opinions, it makes a comparison

11:22:35  21  offering the opinion that the structures from plaintiff's

11:22:39  22  Objectiva code are, in fact, in the Objectiva product.  He offers

11:22:43  23  other comparisons between other code bases, including a

11:22:49  24  comparison between what is in plaintiff's code and the tool that

11:22:54  25  Mr. Anderson created and used at IBM using plaintiff's source

| | | |
|---|---|---|
| 11:22:59 | 1 | code. |
| 11:22:59 | 2 | So there's two uses at IBM.  One is, Mr. Anderson |
| 11:23:03 | 3 | created this tool at IBM using plaintiff's source code.  The |
| 11:23:08 | 4 | second is he imported structures from that source code, and those |
| 11:23:11 | 5 | structures are in IBM's product itself.  And plaintiff -- and Mr. |
| 11:23:15 | 6 | Easttom tends to -- intends to testify as to his analysis of |
| 11:23:19 | 7 | both. |
| 11:23:20 | 8 | THE COURT:  All right. |
| 11:23:24 | 9 | MR. COX:  Thank you, your Honor. |
| 11:23:27 | 10 | During Mr. Easttom's deposition, one of the questions |
| 11:23:33 | 11 | we asked him was whether he thought it would be a good idea to |
| 11:23:35 | 12 | compare to this publicly distributed source code from the |
| 11:23:39 | 13 | University of Illinois in mid-1998.  He said that would be the |
| 11:23:43 | 14 | perfect comparison to look at sort of what was publicly disclosed |
| 11:23:46 | 15 | and what wasn't.  He didn't do that.  He didn't look at all as to |
| 11:23:49 | 16 | what was actually sent out in the public. |
| 11:23:51 | 17 | That's one of the arguments we have about -- |
| 11:23:53 | 18 | THE COURT:  Wait a minute, who sent it out to the |
| 11:23:54 | 19 | public? |
| 11:23:55 | 20 | MR. COX:  That Francis Anderson and Objectiva.  And Mr. |
| 11:23:58 | 21 | Sisoian, again, testified he knew full well what was going to |
| 11:24:01 | 22 | that conference in terms of materials. |
| 11:24:03 | 23 | THE COURT:  Now you're backtracking on me. |
| 11:24:09 | 24 | So the source code that went to the public disclosure |
| 11:24:13 | 25 | alleged, the expert didn't check it. |

11:24:22   1          MR. COX:  That's right, your Honor.  That's right.

11:24:24   2          THE COURT:  So he didn't -- okay.

11:24:25   3          MR. COX:  That's right.  So that's the May 1998

11:24:27   4   disclosure at the University of Illinois.

11:24:28   5          And, again, this is not our burden to prove what might

11:24:32   6   be left as a trade secret.  The entire source code was

11:24:35   7   transmitted without confidentiality, and this guy's had it for 19

11:24:40   8   years and never been asked for it back.  Others may have it, too.

11:24:43   9   But it's not IBM's burden to sort of distinguish as parts of the

11:24:48   10  code what was publicly available and what was not.  It's the

11:24:51   11  plaintiff's burden to come forward and say, this was a true

11:24:54   12  secret, and they can't do that.

11:24:56   13         Again, Mr. Yoder has no connection to Objectiva.  No

11:25:00   14  confidentiality agreement.  It's not enough to say the trade

11:25:04   15  secret is everything else except what was publicly disclosed.

11:25:07   16  It's the plaintiff's burden under Bass to come forward with

11:25:11   17  something stronger than that.

11:25:13   18         And more to the point on Mr. Easttom, he has a variety

11:25:15   19  of opinions which we've set forth in the brief in terms of

11:25:19   20  know-how.  This was one of Mr. Sisoian's alleged trade secrets,

11:25:22   21  not just the source code but the know-how with these source code

11:25:26   22  and the software, didn't look at the know-how, has no opinions

11:25:30   23  about that.

11:25:30   24         And a lot of that, your Honor, we're just trying to

11:25:33   25  keep from the jury at all because we know what he did and we know

| | | |
|---|---|---|
| 11:25:36 | 1 | what Mr. Easttom didn't do, in terms of comparing to what was |
| 11:25:39 | 2 | publicly available and has been for the last 19 years.  We want |
| 11:25:43 | 3 | to really cabin his testimony to things that speak to the |
| 11:25:46 | 4 | ultimate issues in the case. |
| 11:25:52 | 5 | MR. GERVEY:  Your Honor, with permission, I'd like to |
| 11:25:54 | 6 | respond very briefly. |
| 11:25:54 | 7 | THE COURT:  Sure. |
| 11:25:58 | 8 | MR. GERVEY:  Your Honor, as our forthcoming response |
| 11:26:05 | 9 | will demonstrate, Mr. Easttom compared what was allegedly |
| 11:26:09 | 10 | disclosed to the person who was responsible for putting the code |
| 11:26:14 | 11 | on the computer at the conference.  He compares in detail that |
| 11:26:20 | 12 | version of the source code to many versions of the source code |
| 11:26:24 | 13 | that were in plaintiff's possession, both before and after the |
| 11:26:27 | 14 | conference, establishing significant differences in the source |
| 11:26:30 | 15 | code. |
| 11:26:31 | 16 | So it is our view that -- and his opinions on -- |
| 11:26:39 | 17 | regarding those comparisons are well-reasoned and admissible in |
| 11:26:43 | 18 | this case.  But as a factual matter, it is incorrect to state |
| 11:26:45 | 19 | that he did not make those comparisons when, in fact, he did. |
| 11:26:51 | 20 | THE COURT:  Took me around the rosie there.  He didn't |
| 11:26:58 | 21 | compare the actual source code that went out to the conference, |
| 11:27:06 | 22 | but he compared other source codes that are supposedly similar. |
| 11:27:13 | 23 | Is that what you're telling me? |
| 11:27:15 | 24 | MR. GERVEY:  Your Honor, he took the source code that |
| 11:27:19 | 25 | in terms of going to the conference was present at the |

11:27:22   1   conference.  He took those -- that source code and compared it to

11:27:27   2   plaintiff's code and not only one version of that code but many

11:27:30   3   versions of it.  Also, there were additional two years of

11:27:33   4   development, nearly two years that went on after the conference

11:27:36   5   in which there is new source code that is developed following the

11:27:40   6   conference that could not have been disclosed, and he compared it

11:27:43   7   to all of that code.

11:27:45   8       So it is incorrect to say he didn't take the code that

11:27:49   9   was at the conference and compare it to plaintiff's code.  He

11:27:54   10   conducted numerous pages of that specific comparison, in fact,

11:27:57   11   has an entire report addressing that question, and that will be

11:28:05   12   laid out in our forthcoming response, your Honor.

11:28:06   13       THE COURT:  All right.  Counsel, y'all have been

11:28:12   14   patient.  I appreciate it.  Every little bit of preparation

11:28:18   15   before y'all get here to select the jury is helpful.  I still

11:28:22   16   think the same thing I've told you the last two times you've been

11:28:24   17   here.  Of course, there have been different lawyers that may have

11:28:30   18   seen the tide come in and didn't want to be on the ship.  I don't

11:28:35   19   know why, but there's been a bunch of lawyers in and out of this

11:28:39   20   case.  Still a case I think on behalf of the plaintiff ought to

11:28:45   21   be settled.

11:28:46   22       And I will let you go home with those remarks.

11:28:52   23       MR. GERVEY:  Thank you.

            24       (End of proceedings.)

            25

1                            * * * * * *

2

3

4    UNITED STATES DISTRICT COURT )

5    WESTERN DISTRICT OF TEXAS    )

6

7        I, LILY I. REZNIK, Certified Realtime Reporter, Registered

8    Merit Reporter, in my capacity as Official Court Reporter of the

9    United States District Court, Western District of Texas, do

10   certify that the foregoing is a correct transcript from the

11   record of proceedings in the above-entitled matter.

12       I certify that the transcript fees and format comply with

13   those prescribed by the Court and Judicial Conference of the

14   United States.

15       WITNESS MY OFFICIAL HAND this the 24th day of July, 2017.

16

17

18                                  /s/Lily I. Reznik
                                    LILY I. REZNIK, CRR, RMR
19                                  Official Court Reporter
                                    United States District Court
20                                  Austin Division
                                    501 W. 5th Street, Suite 4153
21                                  Austin, Texas 78701
                                    (512)391-8792
22                                  Certification No. 4481
                                    Expires:  12-31-18
23

24

25